

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2015 JUN -1 AM 9: 01

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 71341-8-I |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| PETER MARTUIS RODRIQUEZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 1, 2015 |
| | ) | |

DWYER, J. — Following a jury trial, Peter Rodriquez was convicted of assault in the second degree by strangulation for choking Lori Hendon. Rodriquez's primary contention on appeal is that insufficient evidence was adduced at trial to establish, as required by statute, that Hendon's breathing or blood flow was "obstructed" when Rodriquez choked her. He also contends that, at his request, a Petrich[1] instruction should have been given to the jury and that evidence of the content of Hendon's 911 call constituted inadmissible hearsay that should not have been admitted at trial. Because Rodriquez does not establish an entitlement to relief on any of his claims, we affirm.

I

Hendon and Rodriquez dated intermittently for 15 years. During that time, she would occasionally allow him to reside in her home. In September 2013, Rodriquez was staying at Hendon's home, which she shared with her teenage daughter.

---

[1] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984).

On the night of September 14, 2013, Rodriquez went out to watch a boxing match at a friend's house. He testified that he was "all riled up from the fight," so he went to a sports bar and drank "pitchers of beer" with friends until 1:30 a.m. He then drove to an after-hours club, where he drank more alcohol and became involved in a "full on fight" with someone whom he associated with Hendon. After being escorted out of the club by security staff, Rodriquez headed to Hendon's house. He described himself as injured and upset.

Hendon awoke at around 4:00 a.m. to see Rodriquez outside, parking the car crookedly. Hendon believed that he was intoxicated and met him at the door to offer him some food. Rodriquez instead grabbed her by the throat with one hand and squeezed, threatening to "kick [her] ass" and telling her, "I'm going to fuck you up, bitch." When asked at trial if she could breathe, Hendon said, "No, not really; with the grace of God." She followed Rodriquez upstairs to the hallway "trying to plead a case because I don't want him to jump on me" when he "socked" her in the jaw and "choked" her again. Moving into the kitchen, he began threatening her and repeating "how he was going to fuck [her] up." Rodriquez struck her and put his hands around her throat again, causing her difficulty breathing. These assaults happened within "seconds" of each other.[2]

On cross-examination, Hendon admitted that she could not remember whether Rodriquez choked her two or three times that night. She explained, "I

_____

[2] Q.  Ms. Hendon, how long did this happen from the time that Mr. Rodriquez came to your front door to the time that you and your daughter walked out of the front door, do you think?
A.  I want to say about -- seconds.
Q.  You moved to a couple different places?
A.  Yeah. I mean, just within the house. Things were happening fast.
Q.  So it seemed like it went fast?
A.  Yeah.

was also traumatized at the time . . . but I know it was between two and three [times]." She confirmed that she "had trouble breathing" when Rodriquez put his hands on her neck. When asked again about whether he "cut off" her breathing, she repeated twice, "Through the grace of God." The choking episodes left permanent scars on her neck that she displayed to the jury. Hendon attributed the scars to both the assault on September 15 and another assault by Rodriquez the week before.[3]

After Rodriquez choked her for the final time, a frantic Hendon awoke her sleeping daughter and, together, they fled their home. She ran around the corner and hid in a bush in her pajamas, with no shoes on, despite the cold, having left her keys and coat behind due to her panicked state. She testified that she "was scared that he was going to come around the corner and come out of the house." Hendon called 911 from the bushes. She recalled the pain in her neck and her difficulty breathing while making the 911 call, which she described as different from that caused by her cigarette smoking.

Seattle Police Officer Mark Body was dispatched at around 4:26 a.m. and arrived within minutes, flagged down by Hendon near her hiding spot. Body described Hendon as "very, very upset," "very emotional," and "close to tears when she was describing what had happened." Her description of the incident was consistent with her injuries, which included swelling along both sides of her jaw line, minor discoloration on one side, and marks on her neck "that appeared to have been a grabbing of some sort." Body photographed her injuries. Hendon

---

[3] In the week prior to the charged incident, Rodriquez had grabbed Hendon by the neck and hit her on the side of her legs with a stick, leaving bruises "[a]ll up and down [her] body."

- 3 -

also told him about the previous week's attack, but not that it involved choking. Hendon mentioned only one instance of choking to Body.

Seattle Police Officer Doug Beard joined Body at the scene seven minutes after receiving the dispatch. Beard confirmed that Hendon was dressed only in pajamas and had left her home without even her keys, and that she displayed injuries consistent with the described assault. He observed darkness around her neck on both sides of her trachea, and some swelling on one side. He also saw bruising on her leg and left arm, which she attributed to the prior incident. Beard noted that those bruises appeared to be older, "whereas the - around the neck and jaw line it appeared more vibrant red and swollen." Beard testified "that [Hendon] was rattled, that she was fearful of going back into her residence" and "really insistent on wanting police to go with her and make sure that it was safe for her to go back into her own home." He recalled Hendon's "repeat[ed] statements about concern for her safety and just her overall body language, a little bit of the shaking and trembling." She kept asking Beard, "Are you going to be able to help me? Can you go to my home and check and make sure everything's okay? What am I going to do, I mean, I have nowhere to go. My daughter and I don't even have shoes on." Hendon described one instance of choking to Beard as well. Her daughter appeared "very upset."

After the trial court denied his motion to dismiss for lack of sufficient evidence at the close of the State's case, Rodriquez elected to testify. In addition to describing his drinking and fighting that evening prior to the incident, Rodriquez admitted that he was "maybe a little loud in my talking to [Hendon] . . .

and everything, because I felt like the guy who I had got into it with, one of her girlfriends knew him." He described the evening as "a bad night" and confessed that he "started getting loud" about whether she knew the man who had fought with him, and that she was trying to calm him down. He testified that he told her "fuck you" when she offered him something to eat: "I'm hell with it, she's going to ask me do I want to eat some food. . . . I jumped on her trying to explain to you that I don't want to eat."

Rodriquez then testified that Hendon simply left the house for an unknown reason at 4:00 a.m., "probably now thinking that I'm belligerent towards her." When asked why she might have thought this, Rodriquez said, "Because it's easy for anyone to see that you're going to be - or out of hand if you tell them you just been jumped on and you you're sweating your face is swollen." He described Hendon as "a real timid person" and that "she looked at me like you still huffing and puffing, hey, the fight is over. I'm - that's how I'm saying she may have perceived."

Rodriquez was charged by information with assault in the second degree-domestic violence. The State also charged the aggravating factor of a history of domestic violence. The State alleged that Rodriquez assaulted Hendon by strangulation. A jury found Rodriquez guilty as charged. Rodriquez stipulated to the existence of the aggravating factor. The trial court sentenced Rodriquez to an exceptional sentence of 25 months of incarceration.

II

Rodriquez contends that insufficient evidence supports the jury's verdict of guilt. This is so, he asserts, because the State did not establish that Hendon's breathing or blood flow was "obstructed" when he choked her, as required by statute. His contention is unavailing.

The due process clauses of the federal and state constitutions require that the State prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

A claim of evidentiary insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury on questions of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

"The purpose of this standard of review is to ensure that the trial court fact finder 'rationally appl[ied]' the constitutional standard required by the due process clause of the Fourteenth Amendment, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt." State v. Rattana Keo Phuong, 174 Wn. App. 494, 502, 299 P.3d 37 (2013) (alteration in original) (quoting Jackson, 443 U.S. at 317-18). The standard of review is also designed to ensure that the fact finder at trial reached the "subjective state of near certitude of the guilt of the accused," as required by the Fourteenth Amendment's proof beyond a reasonable doubt standard. Jackson, 443 U.S. at 315.

Rodriquez was convicted of assault in the second degree by strangulation. "A person is guilty of assault in the second degree if he or she . . . [a]ssaults another by strangulation." RCW 9A.36.021(1)(g). "Strangulation" is defined generally as "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). The parties' dispute in this case centers on the word "obstruct," which is not defined in the criminal code.

"The meaning of a statute is a question of law reviewed de novo." Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "Our primary duty in interpreting a statute is to discern and implement legislative intent." Johnson v. Recreational Equip., Inc., 159 Wn. App. 939, 946, 247 P.3d 18 (2011) (citing Campbell & Gwinn, 146 Wn.2d at 9). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Campbell & Gwinn, 146 Wn.2d at 9-10.

"[U]nder the 'plain meaning' rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained." Campbell & Gwinn, 146 Wn.2d at 10.

"Further, a court must not add words where the legislature has chosen not to include them. A court also must construe statutes such that all of the language is given effect, and 'no portion [is] rendered meaningless or superfluous.'" Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003) (alteration in original) (internal quotation marks omitted) (quoting State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003)). "[I]f, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." Campbell & Gwinn, 146 Wn.2d at 12.

Rodriquez first asserts that "obstruct" necessarily means to *completely* obstruct. However, this narrow definition conflicts with the ordinary meaning of obstruct, as evidenced by its common usage and its dictionary definition.

In common parlance, "obstruct" is frequently modified by some variant of either "partial" or "complete." Thus, it is often said that traffic is either completely or partially obstructed by an accident, or that a person's artery is either partially or completely obstructed by plaque. This usage suggests, in accordance with the interpretation urged by the State, that the word obstruct—without a relevant

limiting modifier—may mean to obstruct either partially or completely. The word describes acts of obstruction to some—that is, any—degree.

Rodriquez's primary argument to the contrary is based on his reading of the dictionary. Webster's Third New International Dictionary provides, in pertinent part, that "obstruct" means:

> **1:** to block up: stop up or close up: place an obstacle in or fill with obstacles or impediments to passing <traffic [obstruct]ing the street> <veins [obstruct]ed by clots> **2:** to be or come in the way of: hinder from passing, action, or operation: IMPEDE, RETARD <unwise rules [obstruct] legislation> <constant interruptions [obstruct] our progress>

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1559 (2002).

Rodriquez contends that the first definition, which—not coincidentally—he perceives as the most favorable to his position, necessarily provides the ordinary meaning of obstruct. He asserts that this is so simply because it is listed first. He describes the other definitions as "secondary." By this, he means that they are inferior and, as such, should be accorded less significance. However, the hierarchy Rodriquez proposes was both anticipated and disclaimed by the authors of the dictionary upon which he relies.

The lexicographic notes to Webster's provide, in pertinent part:

> The system of separating by numbers and letters reflects something of the semantic relationship between various senses of a word. It is only a lexical convenience. It does not evaluate senses or establish an enduring hierarchy of importance among them. The best sense is the one that most aptly fits the context of an actual genuine utterance.

WEBSTER'S, supra, at 17a.

Rodriquez also asserts that, simply because there are multiple senses of the word "obstruct," the strangulation definition is ambiguous. However, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." Brown v. Gardner, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994). In attempting to discern legislative intent, our task is not limited to counting dictionary definitions. Thus, if the second definition set forth in Webster's best comports with the legislature's intent, it is the definition that should be applied.

We conclude that it does. The second definition more clearly communicates the reality that, in the strangulation context, a person's breathing or blood flow is obstructed in degrees, not discrete intervals. That is, when strangled, a person's breathing or blood flow is not obstructed by the imposition of one or more obstacles in the way. Rather, a person's breathing or blood flow is obstructed more or less based on the amount of compression applied. Whereas the first definition seems to imply that a person's breathing or blood flow would be obstructed in parts, the second definition better conveys that a person's breathing and blood flow may be obstructed to any degree.

Further, even were we to accept that the definition listed first controls our analysis, Rodriquez's reliance on that definition is misplaced. Even his preferred definition supports an interpretation that, absent a relevant limiting modifier, the word obstruct describes acts of both partial and complete obstruction. Thus, as provided in that definition, obstruct means both to "place an obstacle in"—to partially obstruct—and to "fill with obstacles"—to completely obstruct.

The legislative context of the strangulation statute confirms that the legislature intended the ordinary meaning set forth as the second option in Webster's. In the same bill that both amended the assault in the second degree statute to include assault by strangulation and defined strangulation, the legislature included the following declaration:

> The legislature finds that assault by strangulation may result in immobilization of a victim, may cause a loss of consciousness, injury, or even death, and has been a factor in a significant number of domestic violence related assaults and fatalities. While not limited to acts of assault against an intimate partner, assault by strangulation is often knowingly inflicted upon an intimate partner with the intent to commit physical injury, or substantial or great bodily harm. Strangulation is one of the most lethal forms of domestic violence. The particular cruelty of this offense and its potential effects upon a victim both physically and psychologically, merit its categorization as a ranked felony offense under chapter 9A.36 RCW.

LAWS OF 2007, ch. 79, § 1.

The legislature's stated motivation applies equally to both categories of victims. Like a victim whose breathing is completely obstructed, a victim whose breathing is partially obstructed may be immobilized, lose consciousness, or—as demonstrated by the facts of this case—suffer other physical injuries, including injuries that leave permanent physical scars. In fact, a victim of repeated and sustained—but partial—obstructions might suffer greater lasting damage than a victim of a single, brief—but complete—obstruction. Nothing in the legislative declaration indicates that the enactment was intended to protect victims whose ability to breathe or blood flow was cut off completely while not protecting victims whose breathing or blood flow was hindered to a lesser degree.

Nevertheless, Rodriquez argues that, because the legislature characterized strangulation as a *lethal* form of domestic violence, it intended "to punish actually strangling, which is a lethal action or intent." Appellant's Br. at 8. This argument is premised upon two faulty assumptions: that choking is lethal only if a victim's breathing or blood flow is completely obstructed, and that partially obstructing a victim's ability to breath is necessarily a nonlethal action. It also ignores the legislature's references to a host of other, nonlethal consequences of strangulation, including psychological harm. His argument in this regard is most unpersuasive.

We conclude that the plain meaning of obstruct in the strangulation statute is to hinder or block to some degree. That is, the statute applies equally to complete and partial obstructions of either a victim's ability to breathe or to experience blood flow.

Having so concluded, it is clear that sufficient evidence was presented at trial to support the jury's finding that Rodriquez obstructed Hendon's breathing when he choked her. Evidence adduced at trial established that, in a rapid series of events, Rodriquez more than once grabbed Hendon by the throat and squeezed her neck. This action caused Hendon difficulty breathing at the time and for minutes afterward. It also left permanent scars on her neck.[4] The jury was presented with sufficient evidence to constitutionally authorize its verdict.

---

[4] The State asserts that, even if we were to conclude that obstruct means completely obstruct, sufficient evidence was presented to support a finding that Rodriquez acted with the specific intent to completely obstruct Hendon's ability to breathe. The State further contends that this supports his conviction pursuant to the statutory language criminalizing the act of compressing a person's neck "with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). We agree. Evidence adduced at trial established that Rodriquez grabbed Hendon by the throat and forcefully squeezed it. His action impaired her breathing at the

III

Rodriquez next contends that the trial court violated his right to a unanimous jury verdict. This is so, he asserts, because it denied his request for a unanimity instruction and the State did not elect which strangulation formed the basis for the conviction. His argument fails.

Criminal defendants have a right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega–Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). Where the State presents evidence of multiple acts that could constitute the crime charged, it generally "must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act." State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988); State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984). Failure to do so can be constitutional error because of "the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wn.2d at 411. Neither an election by the State nor a unanimity instruction is required, however, where multiple acts form a continuing course of criminal conduct. State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991).

To determine whether multiple acts form one continuing offense, courts must view the facts in a commonsense manner. Petrich, 101 Wn.2d at 571. Evidence that multiple acts were intended to secure the same objective supports

---

time, continued to make it difficult for her to breathe afterward, and left permanent scars on her neck. Moreover, at the time he grabbed her, Rodriquez told Hendon that he was going to "fuck [her] up." The jury could find this utterance to be a statement of his intent (coupled with his action) to strangle her.

a finding that the defendant's conduct was a continuing course of conduct. State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). Courts also consider whether the conduct occurred at different times and places or against different victims. Petrich, 101 Wn.2d at 571. Assault can be a continuing course of conduct crime. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 985, 329 P.3d 78 (2014).

Here, a commonsense evaluation of the evidence shows that Rodriquez's multiple acts of strangulation were part of a continuous course of conduct. The assaults involved the same parties—Rodriquez and Hendon—and occurred in the same place: "within the house." They were also intended to achieve the same common objective, as stated by Rodriquez himself: to "fuck [Hendon] up" and "kick [her] ass." Rodriquez reiterated this singular purpose throughout the incident, repeating that he was "going to fuck [her] up and this, that, and the other" after the first strangulation and "making all these different threats to [her]" in the kitchen. Rodriquez admitted at trial that he was in a foul mood, beset with hostility toward Hendon for her supposed association with the man who had beaten him, which supported his motive and intent to hurt her. Moreover, the assaults occurred over an extremely short period of time. Hendon described them as happening within "seconds" of one another and emphasized that "[t]hings were happening fast." The interconnectedness of Rodriquez's acts is further supported by Hendon's uncertainty as to whether she was choked two or three times that night. It might have been easier for Hendon to distinguish between the night's events had they not involved the same people, occurred in

the same place, and unfolded in quick succession.

The multiple acts of strangulation were part of the same course of conduct. Thus, neither a unanimity instruction nor an election was necessary.

IV

Rodriquez next contends that the trial court erred in admitting a recording of Hendon's 911 call. This is so, he contends, because there was "no showing that Ms. Hendon was under the continuing stress of excitement . . . when she called 911." Appellant's Br. at 16. We disagree.

Pursuant to ER 803(a)(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" may be admissible as an exception to the hearsay rule.

> This exception is based on the idea that "under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control." The utterance of a person in such a state is believed to be "a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock", rather than an expression based on reflection or self interest.

State v. Chapin, 118 Wn.2d 681, 686, 826 P.2d 194 (1992) (citation omitted) (quoting 6 J. Wigmore, *Evidence* § 1747, at 195 (1976)).

"A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event." State v. Magers, 164 Wn.2d 174, 187-88, 189 P.3d 126 (2008). The determination of the first and second elements can be established by circumstantial evidence such as "the declarant's behavior, appearance, and condition; appraisals of the declarant

by others; and the circumstances under which the statement is made." State v. Young, 160 Wn.2d 799, 809-10, 161 P.3d 967 (2007). The key determination is often "whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." State v. Woods, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

A trial court's application of the excited utterance exception to the hearsay rule is reviewed for an abuse of discretion. State v. Thomas, 150 Wn.2d 821, 854, 83 P.3d 970 (2004). Abuse of discretion occurs when the trial court's ruling is manifestly unreasonable or based upon untenable grounds or reasons. State v. Garcia, 179 Wn.2d 828, 844, 318 P.3d 266 (2014).

Hendon made the 911 call herein at issue just after fleeing the house with her daughter, approximately 8 to 10 minutes after her last physical contact with Rodriquez. She called from her hiding spot in a bush. Though it was cold, she wore only her pajamas, with no coat or shoes.

Hendon's ongoing state of excited fear was evident throughout the 911 call. Toward the beginning of the call, after giving her location and telling the operator that she had fled her home, Hendon stated, "I'm scared. . . . I'm around the corner. Me and my daughter are scared." She repeatedly begged the operator to send help as soon as possible. She emphasized her fear, saying, "[H]e's scarin' me, so please come," a sentiment that she repeated throughout the call.

When asked what happened, Hendon simply urged, "Hurry up. He- he came in drinkin' and every- please, I got bruises and everything, so please come help me." She told the operator, "He put his hands around my throat," and confirmed that "[she] called right when [she] walked out," indicating that little time had passed since the event. She reiterated her concern several times that Rodriquez was close by and might be in pursuit, telling the operator, "I got a hide" and repeated that she was "hiding" around the corner because she was "scared to be out cause it's a main street." Toward the end of the call she asked her daughter, "Can you see a police car up here, no? Then get back."

At no point did Hendon's urgency or fear abate during the conversation. Midway through the call, she demanded of the operator, "Are they on their way? How fast are they gonna be here?" Immediately before the police finally arrived, Hendon twice more repeated that she was "scared" and needed to talk to the officer upon his arrival. Only when she saw the police did she venture from her hiding place.

During the call, Hendon was breathing hard. Her voice was frantic and she was speaking in hushed tones, in an attempt to prevent Rodriquez from hearing her as she hid in the bushes. The operator was finally forced to ask her, "Can you take a deep breath cause I can barely hear [you]." Hendon replied, "Cause I'm scared."

Despite overwhelming evidence that Hendon remained in an excited state throughout the 911 call, Rodriquez argues that Hendon's statements did not meet the requirements of the excited utterance exception simply because she

made allegations of a crime. Rodriquez seems to posit that only calls requesting medical assistance alone merit consideration as excited utterances. No such limitation exists under ER 803(a)(2). As Hendon explained succinctly when asked why she had inquired if Rodriquez was going to be arrested: "Because . . . . I was fearing for my life. I wanted to go back home to my house and be at my house peacefully."

The trial court was asked to rule on the admissibility of the recording of Hendon's 911 call as a pretrial matter but reserved its decision until trial, during Hendon's testimony. At that time, it made the following oral ruling:

> I've listened to the 911 tape, and I find that it satisfies the requirements of the excited utterance exception to the hearsay rule. And I base that conclusion on the emotional tone, on the fact that, repeatedly, Ms. Hendon says that she's afraid. I also base that on the fact that because of the emotions that she apparently was feeling, she even has a difficult time tracking what the 911 operator is saying, this is not a situation where somebody's calmly and clinically describing the situation that she has thought about. And therefore I find that it is admissible.

The trial court's decision was reasonable. There was no abuse of discretion.

Affirmed.

_Dwyer, J._

We concur:

_Trickey, J_          _Leach, J_

- 18 -