# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48753-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| TEHL MATTHEW DUNLAP, | |
| Appellant. | |

MAXA, A.C.J. – Tehl Dunlap appeals his convictions of fourth degree assault and unlawful imprisonment. We hold that (1) the judge presiding over the proceedings properly denied Dunlap's affidavit of prejudice because the judge already had granted a motion for authorization of funds for investigative services, which was a discretionary ruling in the case; (2) the presiding judge did not violate the appearance of fairness by not recusing himself because his previous encounter with Dunlap was brief, occurred over 10 years earlier, and did not impact the judge's ability to be fair; and (3) Dunlap cannot raise the unanimity issue for the first time on appeal because the evidence shows that he engaged in a continuous course of conduct, and therefore the trial court did not commit manifest error in failing to give a unanimity instruction.

Accordingly, we affirm Dunlap's convictions of fourth degree assault and unlawful imprisonment.

FACTS

*Background and Charges*

Dunlap had an on and off romantic relationship with Jeneal Thompson throughout 2014 and 2015. On September 27, 2015, Thompson spent the day with a man named Aaron. Thompson had known Aaron for 10 years and referred to him as her brother, although they were not actually related. While Thompson was with Aaron, Dunlap sent Thompson a text message asking her to go out and get a drink with him. Thompson responded that she was spending the day with Aaron and did not want to leave him to go see Dunlap.

Dunlap responded by calling Thompson a liar and accusing her of having an intimate relationship with Aaron. Later, after Aaron and Thompson went to a nearby bar, Dunlap showed up and began arguing with Aaron. A bartender threatened to call the police, and Dunlap left the bar. Aaron later left on foot. Thompson was intoxicated and was unable to drive at that point, so she remained at the bar.

Dunlap eventually returned and offered to give Thompson a ride so she could find Aaron. Thompson agreed and got into Dunlap's truck. Thompson knew of two trailer parks where Aaron had likely gone and asked Dunlap to drive her to those two places. But Dunlap did not drive in the direction of the trailer parks. Instead, he drove around for the next 60 to 90 minutes. Thompson claimed that Dunlap assaulted her multiple times during that period.

The State charged Dunlap with one count of fourth degree assault, first degree kidnapping, unlawful imprisonment, and third degree malicious mischief.

No. 48753-5-II

*Pretrial Matters*

Dunlap's defense counsel made a motion for authorization of funds for investigative services, requesting approval to spend $750 of public funds for a private investigator. The trial court granted the motion. A week later, defense counsel filed an affidavit of prejudice against the same judge who granted the motion. The trial court denied the affidavit of prejudice as untimely because granting the motion for investigative services was a discretionary ruling in the case.

Dunlap then requested that the judge recuse himself because before becoming a judge, he had acted as the defense attorney in an assault trial in which Dunlap was the victim. The judge declined to recuse himself, noting that the trial would have been at least 10 years earlier and that he did not remember Dunlap or the details of the case.

*Trial Testimony and Conviction*

At trial, Thompson testified about the details of the incident. She stated that after Dunlap drove in the wrong direction, he stopped the truck, grabbed Thompson's phone from her hand, and began looking at her messages. Thompson tried to grab her phone back several times, but Dunlap threw it out of the window.

Thompson responded by taking a shotgun that was sitting on the seat between them and throwing it out the door. Dunlap grabbed Thompson by her hair and "ripped [her] head down" while telling her to go get his gun. 1 Report of Proceedings (RP) at 132. Thompson retrieved the gun and got back in the truck. Dunlap then started driving again.

Thompson started to smoke a cigarette, but Dunlap told her she could not smoke in his truck and took the cigarette from her. Thompson claimed that Dunlap put the cigarette out on her chest, getting cigarette ash down her shirt and in her hair.

Dunlap continued driving and yelling at Thompson, calling her a liar. Thompson tried to grab the steering wheel and turn the truck into a ditch so she could get out. Dunlap grabbed her arm and twisted it, then he tried to push her out of the moving truck with his foot. Thompson also tried to grab the keys from the ignition and Dunlap pushed her head into the dashboard.

Dunlap then drove Thompson back to the bar, returning about 60 to 90 minutes after they had left. When Dunlap parked, Thompson threw items out of his truck because she wanted to force him to stop and pick up the items in order to give her time to record his license plate number. Dunlap grabbed Thompson by the hair and forced her head into the seat of his truck and told her to stop throwing things out of his truck. Thompson then ran into the bar and told the bartender to call the police.

Dunlap also testified, but his version of events differed in many ways. He said he grabbed Thompson's phone from her because he was agitated, but said he only dropped it from the truck because she was grabbing the steering wheel to make the truck swerve and he reached to get the wheel back under control. Dunlap said that he tried to hold her off as she tried to grab at the steering wheel in order to defend himself, defend his truck, and prevent them from crashing.

Dunlap said that he tried to drive off after Thompson got out to pick up the shotgun she had thrown out the door. He said that he kept his foot out to try to prevent Thompson from

getting back in the truck, but she would not let go of the truck door and eventually got back in the truck before Dunlap could drive off.

Dunlap denied ever putting a cigarette out on Thompson. He stated that he took the lit cigarette from her and when Thompson tried to grab it back she knocked some of the cigarette ash on her arm. Dunlap did admit to grabbing Thompson by the hair when she was throwing items out of his truck when they returned to the bar.

During closing argument, the State told the jury regarding assault that "there's a whole bunch of them you can pick from here. There were a lot of assaults that happened here." 2 RP at 410-11. The State then noted that Dunlap (1) grabbed Thompson by the hair when she tried to grab the keys or the steering wheel, (2) shoved her head toward the dashboard, (3) tried to push her out of his truck, and (4) grabbed her by the hair when they got back to the bar. The State did not elect which incident it wanted the jury to rely on in considering the single assault charge.

Dunlap did not request a unanimity instruction and the trial court did not instruct the jury on unanimity. Dunlap did not object to the lack of a unanimity instruction. The jury found Dunlap guilty of fourth degree assault and unlawful imprisonment, but not guilty of first degree kidnapping and third degree malicious mischief.

Dunlap appeals his convictions of fourth degree assault and unlawful imprisonment.

ANALYSIS

A.    AFFIDAVIT OF PREJUDICE

Dunlap argues that the judge presiding over the proceedings erred in denying his affidavit of prejudice as untimely. We hold that the judge properly rejected the affidavit of prejudice

5

because it was filed after he already had made a discretionary ruling on Dunlap's motion under CrR 3.1(f) for authorization of investigative services.

  1. Legal Principles

  Former RCW 4.12.040(1) (2009)[1] states that no superior court judge may preside over an action or proceeding if that judge "is prejudiced against any party or attorney, or the interest of any party or attorney appearing in such cause." Under former RCW 4.12.050(1) (2009)[2], a party can establish prejudice by motion, supported by an affidavit that the judge "is prejudiced against such party or attorney, so that such party or attorney cannot, or believes that he or she cannot, have a fair and impartial trial before such judge." If the requirements of former RCW 4.12.050(1) are met, a party can disqualify the judge presiding over the action as a matter of right. *See State v. Gentry*, 183 Wn.2d 749, 759, 356 P.3d 714 (2015). But a party can submit no more than one motion and affidavit of prejudice in any action or proceeding. Former RCW 4.12.050(1).

  Former RCW 4.12.050(1) provides a significant limitation: the motion and affidavit of prejudice must be filed and called to the attention of the judge "before the judge presiding has made any order or ruling involving discretion." An affidavit of prejudice filed after the judge has made a discretionary ruling is untimely. *In re Recall of Lindquist*, 172 Wn.2d 120, 130, 258 P.3d 9 (2011).

---

[1] RCW 4.12.040 was amended by Substitute S.B. No. 5277. LAWS OF 2017, ch. 42, § 1. We apply the statute as it read at the time of the trial court's ruling on the motion.

[2] RCW 4.12.050 was amended by Substitute S.B. No. 5277. LAWS OF 2017, ch. 42, § 2. We apply the statute as it read at the time of the trial court's ruling on the motion.

Whether an affidavit of prejudice requires the disqualification of the trial court judge is a question of law that we review de novo. *See In re Parenting Plan of Hall*, 184 Wn. App. 676, 681, 339 P.3d 178 (2014).

2.  Discretionary Ruling

The issue here is whether the trial court's ruling granting Dunlap's CrR 3.1(f) motion for authorization of investigative services was a discretionary ruling that rendered the subsequent affidavit of prejudice untimely. Dunlap argues that approving the investigative services was merely an administrative ruling that did not involve the exercise of discretion. We disagree.

" 'The exercise of discretion is not involved where a certain action or result follows as a matter of right upon a mere request; rather, the court's discretion is invoked only where, in the exercise of that discretion, the court may either grant or deny a party's request.' " *Lindquist*, 172 Wn.2d at 130 (quoting *Rhinehart v. Seattle Times Co.*, 51 Wn. App. 561, 578, 754 P.2d 1243 (1988)).

CrR 3.1(f)(1) provides that a "lawyer for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in the case may request them by motion to the court." Under CrR 3.1(f)(2), "[u]pon finding the services are necessary and that the defendant is financially unable to obtain them, the court . . . shall authorize the services." The plain language of this rule states that a trial court may deny a motion for investigative services if it finds that (1) the services are unnecessary or (2) the defendant is financially able to obtain them. Therefore, an order granting the motion involves discretion and is more than a mere administrative ruling.

Consistent with this language, appellate courts have reviewed the authorization or denial of other services covered by CrR 3.1(f)(1) for an abuse of discretion. *See State v. Kelly*, 102 Wn.2d 188, 200-01, 685 P.2d 564 (1984) (holding that the trial court did not abuse its discretion in refusing to authorize funds for travel expenses of a treating physician to testify about defendant's injuries when testimony was not necessary for defendant's defense); *State v. Cuthbert*, 154 Wn. App. 318, 336, 225 P.3d 407 (2010) ("[W]e hold that the trial court did not abuse its discretion by refusing to provide funds for Ronald to hire a forensic accountant."); *State v. Adams*, 77 Wn. App. 50, 55, 888 P.2d 1207 (1995) ("[W]e find the trial court did not abuse its discretion when it denied Adams' request for an independent expert"). These cases show that a trial court has discretion to grant or deny motion for investigative services.

Dunlap argues that the trial court's authorization was not discretionary because effective assistance of counsel requires defense counsel to either investigate the case or make a reasonable decision that investigation is not necessary. However, defense counsel's duty to investigate as necessary to provide effective assistance is separate from the trial court's ability to grant or deny a motion to authorize funds for investigative services.

We hold that the trial court properly denied Dunlap's affidavit of prejudice as untimely because it was filed after the trial court had made a discretionary ruling on Dunlap's CrR 3.1(f) motion for investigative services.

B.    APPEARANCE OF FAIRNESS DOCTRINE

Dunlap argues that the judge presiding over his case erred by not recusing himself based on the appearance of fairness doctrine after becoming aware that before becoming a judge he had served as the defense attorney in an assault case in which Dunlap was the victim. We disagree.

1.  Legal Principles

"Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). Under this doctrine, a presiding judge must actually be impartial and also appear to be impartial. *Id.*

The party asserting the appearance of fairness doctrine must show evidence of a judge's actual or potential bias. *Id.* at 187-88. The test for determining whether a judge's impartiality might reasonably be questioned is an objective one that assumes a reasonable person knows and understands all the relevant facts. *State v. Davis*, 175 Wn.2d 287, 306, 290 P.3d 43 (2012). The Code of Judicial Conduct provides guidance for judges and states that a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." CJC 2.11(A). We review a trial judge's decision whether to recuse himself or herself for an abuse of discretion. *Davis*, 175 Wn.2d at 305. A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable reasons or untenable grounds. *State v. Castillo-Lopez*, 192 Wn. App. 741, 746, 370 P.3d 589 (2016), *review denied*, 185 Wn.2d 1038 (2016).

2.  Analysis

Here, the judge presiding over the proceedings did not recognize Dunlap or recall the prior case until it was brought to his attention by defense counsel. Even then, the judge did not remember that Dunlap was the victim, only that the case involved a severe assault. Because the judge did not even remember Dunlap, there was no evidence of actual bias.

Regarding potential bias, the previous case involving Dunlap occurred at least 10 years earlier. Dunlap was the victim, not a party. And the judge Dunlap sought to recuse, who at that time was serving as a defense attorney, was not Dunlap's adversary. These facts greatly diminished the potential for bias. A reasonably prudent, disinterested person could not conclude based on the evidence that the judge had potential bias that would prevent Dunlap from receiving a fair, impartial, and neutral hearing.

Accordingly, we hold that the judge presiding over the proceedings did not err in refusing to recuse himself based on the appearance of fairness doctrine.

C.     UNANIMITY INSTRUCTION FOR ASSAULT CHARGE

Dunlap argues that the assault conviction violated his right to a unanimous jury verdict because there were multiple acts that could have supported the conviction, but the jury was not given a unanimity instruction and the State did not elect which act supported the assault charge. We decline to consider the issue because Dunlap failed to object below and cannot raise it for the first time on appeal because he cannot show that the trial court committed a manifest error.

1.    Legal Principles

Under article I, section 21 of the Washington Constitution, criminal defendants have a right to a unanimous jury verdict. *See State v. Rodriquez*, 187 Wn. App. 922, 936, 352 P.3d 200 (2015), *review denied*, 184 Wn.2d 1011 (2015). Generally, in cases where there is evidence of multiple acts that could support the crime charged, either the State must elect which act the jury should consider in its deliberations or the trial court must instruct the jury to unanimously agree on a specific criminal act. *Id.* The failure to do either can be constitutional error if it is possible

10

that some jurors relied on one act and some on another act, rendering that verdict not unanimous. *Id.*

However, election by the State or a unanimity instruction is required "only when the State presents evidence of several *distinct* criminal acts." *State v. McNearney*, 193 Wn. App. 136, 141, 373 P.3d 265 (2016) (emphasis added). Neither election nor a unanimity instruction is needed if the defendant engages in multiple acts that form a single continuing course of criminal conduct. *Rodriquez*, 187 Wn. App. at 936. In other words, the jury does not need to be unanimous regarding which of the acts in a continuing course of conduct supports the conviction. In a continuing course of conduct situation, each juror can choose one of the defendant's multiple acts in reaching a verdict.

In determining whether multiple acts form a continuing course of conduct, we view the facts in a commonsense manner. *Id.* at 937. We consider whether the acts were against the same victim, occurred in the same place, and occurred within the same time period, and were committed for the same objective. *Id.* Assault can be a continuing course of conduct crime. *Id.*

2. Issue Raised for First Time on Appeal

Dunlap argues that he can raise the unanimity issue for the first time on appeal under RAP 2.5(a)(3) because it is a manifest constitutional error. Generally, an appellant cannot raise an issue for the first time on appeal. RAP 2.5(a). However, an appellant can raise an alleged error for the first time on appeal if it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). In order to raise an issue for the first time on appeal under RAP 2.5(a)(3), the appellant must demonstrate that (1) the error is manifest and (2) is truly of a constitutional dimension. *McNearney*, 193 Wn. App. at 141.

An error is manifest if there is actual prejudice. *Id.* at 142. In determining whether an error is manifest, we focus our analysis on whether the error is so obvious on the record as to warrant review. *Id.* An appellant shows actual prejudice by making a plausible showing that the alleged error had practical and identifiable consequences at trial. *Id.* To determine whether an error is "practical and identifiable," we place ourselves in the trial court's shoes and ask whether, given what the court knew at the time, it could have corrected the error. *Id.*

Significantly, in addressing the waiver issue we do not engage in the same analysis the trial court would have conducted if the defendant had proposed a unanimity instruction or objected to the failure to give one. *Id.* at 143. We decline to address claims where (1) the trial court could not have foreseen the potential error or (2) the prosecutor or defense counsel could have been justified in their actions or failure to object. *Id.* at 142.

Regarding a unanimity instruction, we must place ourselves in the shoes of the trial court and ask whether it was "apparent" that the events "could be viewed as separate acts, as opposed to a continuing course of conduct." *Id.* at 142-43.

3. Manifest Error Analysis

Dunlap did not propose a unanimity instruction or object to the instructions given at trial. The issue of unanimity was not raised below. And the State does not dispute that the alleged error is one of constitutional magnitude. The question here is whether the alleged error was manifest.

The State asserts that the lack of a unanimity election or instruction was not manifest error because the evidence showed that Dunlap's multiple assaults against Thompson formed a single continuing course of criminal conduct, rather than constituted multiple distinct acts. This

position is consistent with the State's charges; Dunlap was charged with only a single count of fourth degree assault rather than with multiple counts. If Dunlap's actions can be considered a continuing course of criminal conduct, then no unanimity instruction or election was necessary. *Rodriquez*, 187 Wn. App. at 936.

Significantly, we need to consider the State's continuing course of conduct argument in the context of its larger waiver argument. *McNearney*, 193 Wn. App. at 143. That means that we are not determining whether or not Dunlap's actions actually were a continuing course of criminal conduct, but rather focusing on whether it was apparent that the actions were multiple separate assaults rather than a continuing course of criminal conduct such that Dunlap's alleged unanimity error was manifest. *See id.*

Viewing the evidence in a commonsense manner, the applicable factors favor finding that Dunlap's assaults against Thompson were one course of conduct rather than distinct acts. First, Dunlap's actions were all directed toward the same victim, Thompson.

Second, all the events took place in or around the same place: Dunlap's truck. In fact, they primarily occurred while Dunlap was unlawfully confining Thompson in the truck, as shown by Dunlap's conviction on the unlawful imprisonment charge. Although Thompson left the truck briefly a few times, there were no "breaks" in the incident during which she was able to fully disengage from the truck.

Third, the events occurred at roughly the same time. Although the incident took place over the course of 60 to 90 minutes, such a period of time is not inconsistent with a continuous course of conduct. *See State v. Crane*, 116 Wn.2d 315, 330, 804 P.2d 10 (1991) (finding a continuous course of conduct when the defendant committed multiple acts of unwitnessed assault

13

against a child victim over a two-hour period); *State v. Marko*, 107 Wn. App. 215, 221, 27 P.3d 228 (2001) (finding a continuing course of conduct for defendant's actions taken over a 90 minute period aimed at intimidating witnesses).

Fourth, although less clear, Dunlap displayed the same general objective in committing the multiple acts of assault. Arguably, some of Dunlap's assaults were "triggered" by various acts of Thompson – throwing his gun out the window, smoking in his truck, trying to grab the steering wheel and ignition keys, and throwing items out of the truck. And Dunlap claimed self-defense for some of the alleged assaults. But the evidence shows that Dunlap had a single, continuing motive – to physically "punish" Thompson because of his anger and jealousy. *See Rodriquez*, 187 Wn. App. at 937 (relying on the defendant's common objective to injure the victim because of his hostility toward her). The fact that he attempted to blame Thompson for his assaults does not demonstrate that he had different objectives in committing them.

Viewing the evidence in a commonsense manner, all of the assaults involved one continuing altercation between Dunlap and Thompson while he drove her around and unlawfully imprisoned her in his truck. Using the language from *McNearney*, "it was not at all apparent" that Dunlap's multiple assaults "could be viewed as separate acts, as opposed to a continuing course of conduct." 193 Wn. App. at 142-43. As a result, putting ourselves in the position of the trial court and considering the factors that support viewing Dunlap's actions as a continuing course of criminal conduct, we conclude that the alleged unanimity error is not manifest. The error would not have been apparent to the trial court.

The dissent argues that the State did not view the evidence as showing a continuing course of conduct because the State stated in closing argument that there were many assaults

No. 48753-5-II

from which the jurors could choose. Dissent at 23. But as noted above, the State's argument was consistent with Dunlap's conduct being a continuing course of conduct. When there is a continuing course of conduct, the jury is not required to be unanimous and can in fact choose from multiple acts. *See Rodriquez*, 187 Wn. App. at 922.

Accordingly, we hold that the error was not manifest and decline to consider the issue for the first time on appeal under RAP 2.5(a).

D.      APPELLATE COSTS

Dunlap requests that we not impose appellate costs on him because he is indigent. We decline to consider this issue. A commissioner of this court will determine whether to award appellate costs under RAP 14.2 if the State decides to file a cost bill and if Dunlap objects.

CONCLUSION

We affirm Dunlap's convictions of fourth degree assault and unlawful imprisonment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, A.C.J.


 I concur:

_____
JOHANSON, J.


15

LEE, J. (dissenting in part) — As the majority acknowledges, criminal defendants have a constitutional right to a unanimous jury verdict. Majority at 10. It is a constitutional error when there is evidence of multiple acts that can support the crime charged, but the State fails to elect which act the jury should consider in reaching its verdict and the trial court fails to instruct the jury that it must unanimously agree on a specific criminal act for a conviction. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

Here, through Thompson's testimony, the State presented evidence of multiple assaults by Dunlap to support its fourth degree assault charge. And the State argued in closing argument that with regard to the assault charge, "[W]ell, there's a whole bunch of them you can pick from here" and that "there are many assaults that happened in this particular case." 2 Verbatim Report of Proceedings (VRP) at 410-11, 454. The State did not elect which assault the jury should consider in reaching its verdict and the trial court did not give a unanimity instruction to the jury. But the majority holds that because there was a continuing course of conduct, there was no error and Dunlap cannot raise his jury unanimity challenge for the first time on appeal. Majority at 14.

I respectfully disagree. Because there was evidence of multiple assaults by Dunlap that could have supported the fourth degree charge, either the State had to elect which assault the jury must unanimously agree on in reaching its verdict or the trial court had to give a jury unanimity instruction. Neither happened. Thus, Dunlap has shown a manifest error affecting his constitutional right to a unanimous jury verdict, and the error was not harmless beyond a reasonable doubt. Therefore, I would reverse.

FACTS

A.      THOMPSON'S TESTIMONY

At trial, Thompson testified as follows:

[Thompson]:  I grabbed his shotgun and opened up the passenger side door and threw it out the door.

. . . .
[State]:  And what did he do as a result of that?

[Thompson]:  He grabbed me by the hair, and he ripped my head down and told me to get his f[**]king gun.

[State]:  And did you?

[Thompson]:  Yes.

[State]:  Okay.  What did you do with it?

[Thompson]:  I handed it back to him.

1 VRP at 131-32.

[State]:  And what's the next thing that happens?

[Thompson]:  Well, first I tried to rip the keys out of the ignition, and he put my head into the dash for that. And he kept driving, and I recognized that we were near my friend's trailer park, and so I tried to grab the steering wheel and swerve it into the ditch so I could get out of the truck, and he tried to break my arm for that. And then he said, "You want out of the f[**]king truck, I'll let you out of the f[**]king truck," and he grabbed me and started trying to shove me out the door after he had reached over to open the door.

1 VRP at 136.  Later in her testimony, Thompson testified about another assault.

[Thompson]:  I tried to grab the steering wheel and serve [sic] it, because at first I asked him to stop. I said, "Just let me out right here. I have a friend right here. Just let me out." And he just kept driving. He didn't say anything. So I tried to grab the steering wheel and swerve it into the ditch, so he grabbed my arm.

. . . .

He grabbed my arm and twisted it.

. . . .

. . . He just grabbed it and twisted it and let go. And he says, "If you want out of this f[**]king truck, I'll let you out of the f[**]king truck, "and he reaches over, shoves open the door, and then he tried to shove me out of the truck.

[State]: Okay. And how does he try to shove you out of the truck?

[Thompson]: He takes his foot and he is trying to kick me out of the truck. . . .

1 VRP at 139, 141-42. Thompson then testifies as to the final assault by Dunlap.

[State]: Okay. So after he attempts to push you out of the car and the door is—or the truck, and the door is closed, then what happens?

[Thompson]: He kept driving, and then he took me back to my truck.

. . . .

Yeah, he took me back to my truck. He took me back to the parking lot.

. . . .

[State]: All right. And then what happens?

[Thompson]: Then I started chucking shit out of his truck, because I wanted to get the license plate. My thought was if I'm chucking shit out of his truck and he gets out to pick it up, then I can run and get the license plate and give to it [sic] the police, because I was calling the police.

[State]: And did you tell him that?

[Thompson]: Oh, God, I told him he was f[**]ked. I said, "How dare you do this to me. You are f[**]ked. I am calling the police. I don't care where I go, I am calling the police.

. . . .

18

[State]: Did he respond to that?

[Thompson]: "Go ahead."

[State]: Okay. And so you start throwing things out?

[Thompson]: Uh-huh.

. . . .

. . . I just started throwing whatever I could that was on the floor of his truck out, hoping he would reach out to grab it. But instead he grabbed my hair and he ripped my head into the seat, and he said, "Don't f[**]king throw anything else out of my goddamn truck." And he let me go, and I got out and I just ran into the bar.

1 VRP at 149-51.

B.      STATE'S CLOSING ARGUMENTS

In closing, the State argued

Count III, assault in the fourth degree, that on or about the dates in question [Dunlap] assaulted [Thompson], and everything happened in the state of Washington.

Well, there's a whole bunch of them you can pick from here. There were a lot of assaults that happened here, okay. He grabbed her by the hair numerous times when she would grab for the keys to try to stop the car. He grabbed her by the hair, shoved her head toward the dashboard. She has the mark, the strap from the seat belt, on her. You have the assaults that happened when he was trying to push her out the truck door. I'll get to that. You have the assault when they get back to the bar, and he grabs her by the hair. He wasn't in any danger there. She's just throwing stuff out of his truck. He didn't need to grab her by the hair. That's an assault as well.

. . . The [S]tate would submit that all the assaults that occurred to [Thompson] would be offensive to the ordinary person.

2 VRP at 410-11.

In rebuttal, the State argued:

> Now, there are many assaults that happened in this particular case, one I want to specifically point out. Even if you believe his story, when they get back to the bar for the final time and they pull up and she's throwing all this stuff out of the truck and he said—he admits, "I reach over, I grab her by the hair, and I push her down, and she gets out of the car, she stops throwing stuff. I'm happy that she's out, and I'm gone."

2 VRP at 454-55. Although the State focused in rebuttal on the assault that occurred in the parking lot where Dunlap grabbed Thompson by the hair, the State focused on that assault to argue against Dunlap's theory of self-defense.

The State did not elect which of the "many assaults" it wanted the jury to consider in deciding the fourth degree assault charge. 2 VRP at 454. And the trial court did not give the jury a unanimity instruction for the fourth degree assault charge.

ANALYSIS

A. Manifest Error Violating Right To Jury Unanimity

Dunlap contends that his right to a unanimous verdict on the fourth degree assault conviction was violated. I agree.

1. Legal Principles

a. Manifest error affecting a constitutional right

RAP 2.5 generally precludes an appellant from raising an issue for the first time on appeal. However, an appellant may raise an issue for the first time on appeal if he can show a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To make such a showing, an appellant must show that "(1) the error is manifest and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

Here, there is no dispute that the claimed error is of constitutional magnitude. *See Kitchen*, 110 Wn.2d at 411 (constitutional error when several acts are alleged and any one of them could

20

constitute the crime charged, but the State fails to elect the particular criminal act upon which it relies upon in seeking a conviction or the trial court fails to instruct the jury that it must unanimously agree on the same underlying criminal act as the basis for a conviction). Therefore, the issue is whether the error is manifest.

An error is manifest if there is actual prejudice. *State v. McNearney*, 193 Wn. App. 136, 142, 373 P.3d 265 (2016). Actual prejudice is shown "by making a plausible showing that the asserted error had practical and identifiable consequences in the trial." *Id.* In determining actual prejudice, the record must be sufficient to determine the merits of the claim. *O'Hara*, 167 Wn.2d at 99. In other words, the error must be "so obvious on the record that the error warrants appellate review." *Id.* at 100.

### b. Jury unanimity

When the State presents evidence that the defendant committed two or more acts and any one of the acts could constitute the crime charged, the State must elect one act on which it relies on for the charged crime to ensure jury unanimity. *Kitchen*, 110 Wn.2d at 411. If the State fails to make an election, then the trial court must provide the jury with a unanimity instruction, instructing the jury that they must all agree on which act constituted the crime charged. *Id.*

The requirement that the State make an election or the trial court give a jury unanimity instruction only applies when the State presents evidence of several distinct criminal acts and any one of them can support the crime charged. *Id.* There is no such requirement if the evidence shows a continuing course of conduct. *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989).

In determining whether multiple acts constitute a continuing course of conduct, the facts must be viewed in a commonsense manner. *Id.* Generally, evidence the multiple acts occurred at

different times and places tends to show that distinct acts occurred rather than a continuing course of conduct. *Id*. Conversely, evidence that the defendant engaged in multiple acts intended to achieve a singular objective tends to show a continuing course of conduct. *Id*.

2. Manifest error affecting Dunlap's right to a unanimous jury verdict

Here, the majority states that "we are not determining whether or not Dunlap's actions actually were a continuing course of criminal conduct, but rather focusing on whether it was apparent that the actions were multiple separate assaults rather than a continuing course of criminal conduct." Majority at 13. The majority goes on to state that "[v]iewing the evidence in a commonsense manner, the applicable factors favor finding that Dunlap's assaults against Thompson were one course of conduct rather than distinct acts." Majority at 13. I respectfully disagree.

Thompson testified that Dunlap assaulted her multiple times. While there is no dispute that Dunlap's acts were all directed at Thompson and took place in or around Dunlap's truck while Dunlap was driving around for 60 to 90 minutes, Thompson's testimony fails to show that Dunlap's acts were intended to secure a singular objective. Rather, Thompson's testimony shows that Dunlap assaulted her multiple times in reaction to something that she had done to Dunlap. Dunlap did not initiate any of the assaults. Rather, Dunlap only grabbed Thompson by the hair and ripped her head down after she threw his shotgun out of the truck. And Dunlap put Thompson's head into the dash after she tried to rip the keys out of the ignition. When Thompson grabbed the steering wheel to swerve the truck into the ditch, Dunlap grabbed her arm and tried to shove her out of the truck. Finally, back at the parking lot, Dunlap grabbed Thompson by the hair

only after Thompson started "chucking" Dunlap's belongings out of truck. *See* 1 VRP at 131-32, 136, 139, 141-42, and 149-51.

The majority relies on the fact that the acts "primarily occurred while Dunlap was unlawfully confining Thompson in the truck," and although Thompson left the truck briefly a few times, she was never able to fully disengage from the truck because Dunlap was unlawfully imprisoning her. Majority at 13. Thompson, however, testified that she got out of the truck to retrieve the shotgun after she threw it out of Dunlap's truck. 1 VRP at 131-32. Thompson also testified that Dunlap tried to shove her out of the truck during one of the assaults. 1 VRP at 139, 141-42.

Moreover, the State apparently did not view the evidence as showing a continuing course of conduct. Rather, the State argued to the jury that "there's a whole bunch of them you can pick from here," including when Dunlap grabbed Thompson's hair multiple times in reaction to what Thompson had done and when Dunlap tried to push her out the truck door. 2 VRP at 410-11. The State never argued, or even indicated, that Dunlap's different assaultive episodes were a continuing and cohesive act done with a singular purpose.

Viewed in a commonsense manner, the evidence fails to show that Dunlap's multiple assaults upon Thompson, all of which were done in reaction to something Thompson had done, were committed to achieve a singular objective. Rather, the evidence presented by the State through Thompson's testimony showed multiple distinct acts upon which the jury could have based its fourth degree assault conviction. Therefore, the State was required to make an election.

And based on Thompson's testimony and the State's closing argument, the trial court could have foreseen the need for a jury unanimity instruction for the fourth degree assault charge. Without either, the jury could have returned a guilty verdict on the fourth degree assault charge because they all agreed that Dunlap committed fourth degree assault, but failed to unanimously agree on which of the assaultive acts they were each relying on in reaching their guilty verdict.

Because the State failed to elect which distinct assaultive act it was relying on for the fourth degree charge and the jury was not instructed that they must unanimously agree on one particular act to reach a verdict on the fourth degree assault charge, actual prejudice is shown. Thus, I submit that contrary to the majority's holding, Dunlap has shown a manifest error affecting his constitutional right to a unanimous jury verdict.

B.      NO HARMLESS ERROR

The State argues that any error in failing to elect a specific act or give a unanimity instruction was harmless error. I disagree.

In a multiple acts case, when the State does not elect a specific act and a unanimity instruction is not given, the error is presumed to result in prejudice. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). The conviction will not be upheld unless the error is harmless beyond a reasonable doubt. *Id.* The State must overcome the presumption of prejudice by showing that no rational juror could have a reasonable doubt as to any of the incidents alleged. *Id.* If the error is not harmless beyond a reasonable doubt, reversal is required. *Id.* at 515.

Here, the State cannot show the error was harmless beyond a reasonable doubt. Thompson's testimony was controverted. *See id.* at 514. Dunlap testified that he tried to drive off after Thompson got out of the truck to pick up the shotgun she had thrown out of the truck. 2 VRP

24

at 323. Dunlap also testified that he stuck his foot out to prevent Thompson from getting back into his truck, whereas Thompson said that he tried to kick her out of the truck. 2 VRP at 323; 1 VRP at 136, 139, 141-42. Dunlap further testified that he had to grab Thompson in self-defense in order to prevent her from crashing the truck when she was grabbing at the steering wheel and the keys. 2 VRP at 324. Dunlap's testimony could have created reasonable doubt about whether one or more of the alleged assaults occurred or were justified and done in self-defense. Therefore, it is possible that the jury convicted Dunlap based on a different underlying assaultive act, rendering its verdict not unanimous.

Accordingly, because Dunlap's assaults on Thompson were distinct multiple acts instead of a continuing course of criminal conduct, I would find that the lack of election or unanimity instruction was not harmless error beyond a reasonable doubt and reverse the fourth degree assault conviction.

_____
Lee, J.