IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  37476-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JARED ANTHONY WINTERER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — For over ten years, Jared Winterer investigated, called, texted, and sent kites, letters and social media posts to Rachel Massey who worked for the Kittitas County Corrections Center.  The communications were of a sexual and threatening nature insisting on an unwelcome intimate relationship with her.  Terrified, Ms. Massey obtained a protection order that Mr. Winterer violated exhaustively resulting in the felony stalking conviction before this court.  Mr. Winterer timely appeals his stalking conviction for the second time, raising several issues.  First, he argues that the evidence is insufficient to support his conviction because all of his communications with the victim are protected speech under the First Amendment to the United States Constitution. Second, he asserts that the trial court improperly denied his motion for mistrial after a witness commented on his prior conviction.  Third, he asserts that defense counsel was

ineffective for failing to object to the admission of an exhibit that was not provided in discovery. Finally, he argues that the trial court's exceptional sentence exceeded its authority. The State concedes sentencing issues. We affirm Mr. Winterer's conviction and remand for resentencing.

BACKGROUND

The State charged Jared Winterer, by amended information, with stalking. Following a jury's verdict, Mr. Winterer appealed and we reversed, finding that his waiver of counsel was invalid. *See State v. Winterer*, No. 35854-2-III (Wash. Ct. App. May 30, 2019) (unpublished), https://courts.wa.gov/opinions/pdf/358542_unp.pdf. On remand, the State amended the charging information to include one count of stalking "on or between February 8, 2016 and December 2, 2016."

At the second trial, the State's primary witness was Ms. Massey, an employee of the Kittitas County Corrections Center. Ms. Massey testified that she originally met Mr. Winterer in high school. She indicated that they were not friends, but rather acquaintances, occasionally seeing each other in town.

Since she has known him, Mr. Winterer has always exhibited inappropriate behavior. He was very persistent, asking for her phone number and then saying "raunchy" things. Although the comments made her feel uncomfortable, Ms. Massey did not take them personally because Mr. Winterer was inappropriate with all women. During this time, Mr. Winterer would contact Ms. Massey on social media and make

crude comments. She would block him and then he would create a new profile and make contact again.

At some point, Ms. Massey began working in the control room at the Kittitas County Corrections Center. Her responsibilities included logging inmate movement and answering the inmate emergency buttons. As an inmate in the jail, Mr. Winterer would use his call button "excessively." Mr. Winterer's comments to Ms. Massey were crude, while simultaneously expressing his love for her. Every time he misused the emergency button, Ms. Massey would tell Mr. Winterer that he could only use the button for emergency calls. Nevertheless, Mr. Winterer continued to misuse the button and was written up numerous times. Ms. Massey testified that at first his comments were annoying, but as they increased in frequency and intensity, they became alarming.

On several occasions, Ms. Massey observed Mr. Winterer become violent with corrections officers. One time Ms. Massey observed Mr. Winterer grabbing an officer by the throat.

Alarmed that Mr. Winterer was becoming obsessed with her, Ms. Massey obtained an anti-harassment order against Mr. Winterer in 2014. According to Ms. Massey, the order did not change anything. Mr. Winterer continued to direct kites to Ms. Massey at work. Ms. Massey became increasingly afraid of Mr. Winterer. In an effort to prevent this contact, Ms. Massey was moved out of the jail control room.

The contacts subsided when Mr. Winterer was sent to prison. Eight months later, in February 2016, Mr. Winterer sent a "Dear jail" letter to the corrections center. At the time, Ms. Massey's duties at the corrections center included opening mail and she testified that she immediately recognized Mr. Winterer's handwriting. While not addressed to her personally, the letter indicated that he would be "homicidal" if Ms. Massey was "with any other man" because his "mind has been consumed by Rachel." The letter appalled and disturbed Ms. Massey.

A second letter from Mr. Winterer was addressed to the "classification clerk" at the Kittitas County Corrections Center. Ms. Massey testified that was her position at the time. The letter referenced a February 2016 hearing on the anti-harassment order, saying that he loved her, and that he was attempting to reassure Ms. Massey that he was not a threat to her. At the same time he suggested that her coworkers would need such an order if they did not stay away from her. The letter worried Ms. Massey because she knew he would be getting out of prison soon and he appeared delusional and obsessed with her. Ms. Massey gave the letter to her supervisor at work.

At some point, Mr. Winterer was returned to the Kittitas County Correction Center from prison. When Mr. Winterer returned to the jail, he began sending daily communications to Ms. Massey. These included kites, letters, using the emergency button, and sending messages through other officers. At one point, Mr. Winterer called Ms. Massey twice on her cell phone from the jail. Ms. Massey recognized his voice on

4

the phone. Ms. Massey's father took the phone and told Mr. Winterer not to call again. This caused Ms. Massey stress. She did not know how he obtained her cell phone number and she was concerned that he would seek her out when he was released from jail.

The persistent communications from Mr. Winterer caused Ms. Massey to fear for her safety. She testified that she was scared that he would come to her house to "get her." She was afraid that "if I was caught alone I would be overpowered." Report of Proceedings (RP) at 187. When he says that he wants to be her boyfriend, "that's disturbing too because they would go from obsessively sweet to very, very angry." RP at 187. Telling him "stop" or "no" is not enough for him because he does not care about the law or what she says, only his desires matter. She is also afraid for other people close to her, her family. RP at 188. He has demonstrated that he can obtain information about her. This makes her scared.

In an interview, Mr. Winterer admitted that he had been "sluthin" Ms. Massey for a long time. He also admitted threatening to kill anybody who interfered with his contact with Rachel.

Mr. Winterer testified in his own defense. He explained that he sustained a traumatic brain injury as a teenager. Mr. Winterer admitted sending communications to Ms. Massey, but denied any intent to cause her alarm or fear. He admitted on direct and

5

cross-examination that he did not care about the court, the jail, or the law, and would continue to contact Ms. Massey even if he was told not to by a judge.

ANALYSIS

A.   SUFFICIENCY OF THE EVIDENCE

Mr. Winterer argues that his harassment conviction was based entirely on constitutionally protected speech and since protected speech cannot form the basis for harassment, the evidence is insufficient to support his conviction.  We decline Mr. Winterer's invitation to reject the holding in *State v. Nguyen*, and instead reaffirm its conclusion: "a violation of the stalking statute is not based on the content of pure speech. Instead, the statute contains an important mens rea element: the statute is violated only based on an "'intent to harass' with a course of conduct that seriously alarms, annoys, harasses, or is detrimental to the victim."  10 Wn. App. 2d 797, 807, 450 P.3d 630 (2019).

Due process requires the State to prove beyond a reasonable doubt every element of a crime.  *State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015).  An insufficient evidence claim "admits the truth of the State's evidence and all reasonable inferences from that evidence."  *Id*.  The critical inquiry is "'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  *Id*. (*quoting Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).  The reviewing court views the evidence in the light most favorable to the prosecution and

determines whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *State v. Garcia*, 179 Wn.2d 828, 836, 318 P.3d 266 (2014). The rule of independent review also applies where the sufficiency of the evidence question raised involves the First Amendment question of whether a defendant's statements constitute a true threat or other form of unprotected speech. *State v. Kilburn*, 151 Wn.2d 36, 52-54, 84 P.3d 1215 (2004) (statement by student that he intended to bring a gun to school deemed not a true threat where the intended audience considered it a jest resulting in reversal of harassment conviction for insufficient evidence).

Under the relevant portions of RCW 9A.46.110(1), a person commits stalking if:

(a) He . . . intentionally and repeatedly harasses or repeatedly follows another person; and

(b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and

(c) The stalker either:

(i) Intends to frighten, intimidate, or harass the person; or

(ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

"'Unlawful harassment' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such

person, and which serves no legitimate or lawful purpose." RCW 10.14.020(2). The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner. *Id.* "'Course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 10.14.020(1). "'Course of conduct' includes, in addition to any other form of communication, contact, or conduct, the sending of an electronic communication, but does not include constitutionally protected free speech. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" RCW 10.14.020(1).

Mr. Winterer argues that since "course of conduct" does not include constitutionally protected speech, and since most speech is protected, "only speech that fits within an existing First Amendment exception can qualify as 'unlawful harassment.'" This argument is a syllogistic fallacy: affirming a conclusion from a negative premise. While it is true that course of conduct does not include constitutionally protected speech, course of conduct does include conduct beyond the content of speech. Mr. Winterer's argument presumes that the course of conduct in his case was based entirely on the content of his speech. It was not.

In *Nguyen*, the defendant continued to contact the victim despite a no-contact order. Over the course of several weeks, the defendant sent dozens of text messages to the protected person. The messages vacillated between pleadings and threats. On appeal,

8

the court rejected a constitutional challenge to the statute and found the evidence sufficient. "Nguyen's course of conduct included repeated and unwanted calls and text messages, and visits to her house. These actions, not the words contained in the text messages, formed the basis for the felony stalking conviction. Based on [the protected person's] past experiences with Nguyen, her fear was objectively reasonable. There is sufficient evidence to support Nguyen's conviction for felony stalking." *Nguyen*, 10 Wn. App. at 814.

Likewise, in this case, Mr. Winterer's course of conduct was his unrepentant and incessant contact with Ms. Massey despite being told that it caused her fear and after being ordered to stop. The content of his speech was relevant for purposes of proving his intent, and the victim's fear, not for proving course of conduct. The course of conduct was sufficient to show harassment and evidence was sufficient to support the conviction for stalking.

B.   MOTION FOR MISTRIAL

Mr. Winterer argues that the trial court abused its discretion by denying his motion for a mistrial after a witness testified that Mr. Winterer had previously been convicted of stalking.

In order to understand the comment, it is necessary to provide context. Mr. Winterer was accused of stalking for making multiple and repeated contacts with Ms. Massey while she was working at the Kittitas County Jail. Many of Mr. Winterer's

contacts were made while he was either an inmate or a prisoner.  Mr. Winterer's first

conviction for stalking was reversed on appeal and remanded for a new trial.  At his

second trial, evidence was presented that Mr. Winterer was transferred from prison to the

jail in order to address allegations that he had violated the terms of his misdemeanor

probation on his conviction for violating the no-contact order.  At a show cause hearing

in district court, Mr. Winterer was found to have violated his probation by sending letters

to Ms. Massey, and the balance of his sentence was imposed.  He served this sentence in

the Kittitas County Jail.

During the trial on the stalking charge, the superior court found that evidence of

Mr. Winterer's prior conviction for violating the no-contact order was relevant to Ms.

Massey's fear.  In attempting to determine the time frame of jail calls, defense counsel

cross-examined Ms. Massey:

> [DEFENSE COUNSEL:]
>
> Q: (off mic')—Massey, you just said you don't recall (inaudible) when he got back from prison—and what was what, (inaudible)?
>
> A: [Massey] I believe so.  The time line is—is very messed up in my head as well.
>
> Q: Okay.  All right.  But the jail calls—were they the same or different as the no-contact order (inaudible).
>
> A: They were—additional—
>
> Q: Those were not the subject of the no-contact order (inaudible), correct?

A: I don't believe so.  I don't believe—the original ones, no.

Q: Okay.  And when you say the original ones, you're talking about 2014?

A: No—

Q: —later.

A: Later.

Q: Okay.  (Inaudible) talking about (inaudible).

A: I think the—I believe the first two were the letters from prison, were the first two—

Q: (Inaudible)—

A: —violations—Yes. So the phone calls would have been after—after prison.

Q: Okay.

A: Yes.

Q: And so the—the letters were the first two and then you testified that when he got back he was convicted of the no-contact order (inaudible)?

A: He was being held on—on the pretrial no-contact order violation, so I don't know if they ever went to court in lower district court.  I think they might have—have all been filed under superior court charges.  That's—

Q: Okay.—

A: Yeah.

Q: —when you said that when he got back he was convicted of a no-contact—

A: (by Ms. Massey) Uh-huh.

11

Q: —violation, do you know whether he was convicted of a no-contact order violation?

A: He was convicted of—of stalking.

Q: (Inaudible). Earlier you testified that he was convicted of a no-contact order violation. Is it your testimony that he was or was not convicted of a no-contact order violation when he came back in (inaudible).

A: I—I don't know. I—I don't know the answer. I'm sorry. I thought he was, but thinking back he might have—it may have all been rolled into the stalking charge. So I don't know for certain if he had a—

Q: (Inaudible).

A: —conviction.

Q: (lnaudible)—

[DEFENSE COUNSEL:] I think we need a recess.

THE COURT. Okay.

RP at 213-15.

At the subsequent recess, Mr. Winterer moved for a mistrial. The prosecutor explained that when Mr. Winterer was returned from prison, he was found to have violated his misdemeanor probation by sending additional letters to Ms. Massey. Ms. Massey knew that Mr. Winterer spent more time in jail for violating the no-contact order but did not appreciate that the jail time was imposed for a probation violation, not a new charge. The trial court denied the motion, noting that the witness expressed confusion and there was already evidence that Mr. Winterer had been convicted of violating the no-contact order and that he had spent significant time in jail and prison. The court offered

to give a limiting instruction about prior convictions and time spent in prison and jail but defense counsel did not request such an instruction and only requested to clarify a few things with the witness.

We review a trial court's decision on a motion for mistrial for abuse of discretion. *State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). On the other hand, "denial of a motion for mistrial should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010).

Initially, we reject the State's argument that any error was invited. The invited error doctrine prevents a defendant from appealing an action of the trial court that the defendant himself procured. *State v. Henderson*, 114 Wn.2d 867, 870, 792 P.2d 514 (1990); *State v. Lewis*, 15 Wn. App. 172, 176-77, 548 P.2d 587 (1976). This prevents counsel from "setting up" the trial court by seeking a specific action of the court and then seeking reversal on the basis of that same action. *State v. Meggyesy*, 90 Wn. App. 693, 707, 958 P.2d 319 (1998) (finding no invited error where the defendant did not invite the particular error he raised on appeal). In this case, defense counsel was not asking the witness to comment on the prior stalking conviction.

While we find that the irregularity was not invited, we also conclude that the trial court did not abuse its discretion by denying Mr. Winterer's motion for a mistrial. In determining whether a trial irregularity warrants a mistrial, we consider the three "*Hopson* factors." *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). The seriousness of the irregularity, whether it involved cumulative evidence, and whether the trial court properly instructed the jury to disregard it. *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989). The trial court is in the best position to discern prejudice. *Id*.

Erroneously mentioning a prior conviction can be serious, but in this case it was not serious enough to materially affect the outcome of the trial. Immediately after suggesting that Mr. Winterer had been convicted of stalking, the witness equivocated, and indicated that she did not know if he had been convicted of violating the no-contact order after returning from prison and it may have been rolled into the stalking charge. While she used the term stalking twice, the second time she indicated that the violation may have been rolled into the stalking charge. Since Mr. Winterer was on trial for the stalking charge, it was not an irregularity for the witness to make this comment. The witness was clearly confused about new charges, violations, and convictions.

Moreover, any error was cumulative because the jury was already aware that Mr. Winterer had a relevant criminal history and had spent time in jail and prison. Defense counsel's tactical decision to decline a liming instruction suggests that the comment was not overly prejudicial. Finally, the evidence in this case was overwhelming. Mr.

14

Winterer did not deny making the communications. He only denied any intent to frighten, intimidate or harass Ms. Massey. RP at 356. In the context of the evidence presented at trial, the comment did not deprive Mr. Winterer of a fair trial.

C.   INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Winterer also argues that his attorney was constitutionally ineffective for failing to object to the admission of Exhibit 27 or assert a discovery violation. Exhibit 27 contained a collection of kites sent by Mr. Winterer to Ms. Massey while Mr. Winterer was an inmate at the jail. When the State moved to admit Exhibit 27, Defense counsel's foundation objection was overruled. At a later point in the trial, counsel notified the court that in reviewing his file, he realized that he had never actually received copies of Exhibit 27 from the State.

The prosecutor indicated that the exhibit was held in the evidence room at the police department. While acknowledging that copies of Exhibit 27 had not been sent to defense counsel, the prosecutor indicated that prior to the first trial, she had provided "an attorney" with a copy of the evidence log with instructions that counsel could view the exhibit at the police station. The same exhibit was admitted at Mr. Winterer's first trial. On appeal, the State points out that Mr. Winterer's attorney at his second trial was stand-by counsel during his first trial.

15

Mr. Winterer's counsel responded "I'm just laying a record. Like I said, it's already been—admitted. I should have asked for a recess to review them better, or done something else." RP at 254.

Both the United States and Washington Constitutions guarantee a criminal defendant the right to effective assistance of counsel. *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018); *see also* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Courts indulge a strong presumption that counsel is effective. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.; s*ee also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The defendant has the burden to show that defense counsel's performance was deficient based on the trial court record. *McFarland*, 127 Wn.2d at 335. Specifically, "the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *Id*. at 336. Claims of ineffective

16

assistance of counsel present mixed questions of law and fact, and are reviewed de novo.

*Lopez*, 190 Wn.2d at 116-17.

In this case, even if Mr. Winterer could show deficient performance, he fails to establish prejudice. Mr. Winterer claims that exhibit 27 was necessary to show repeated contacts. This argument fails to acknowledge exhibit 26, which counsel did have, and which also contained three separately written items sent to Ms. Massey in violation of the anti-harassment order. Thus, exhibit 27 was cumulative. Even if counsel had been successful in suppressing the exhibit for discovery violations, the result of the proceedings would not have been different.

D.   EXCEPTIONAL SENTENCE

Mr. Winterer argues that the trial court exceeded its authority by imposing an exceptional sentence of 120 months without a supporting jury verdict. The State concedes error. The "clearly too lenient" provision of RCW 9.94A.535(2)(b) must be found by a jury. *State v. Borg*, 145 Wn.2d 329, 336-38, 36 P.3d 546 (2001). In this case, the jury did not make this finding. The exceptional sentence exceeded the court's authority.

Upon remand for correction of the exceptional sentence, the trial court will also correct any aggregate term of confinement and community custody to avoid exceeding the statutory maximum. Even though the State disputes the characterization of RCW 9.94A.703(2)(d) discretionary community supervision fees as "costs" under RCW

No. 37476-9-III
*State v. Winterer*

10.01.160(2), it concedes that the trial court may reconsider the issue on remand for the sentence issue.

We affirm Mr. Winterer's conviction for stalking and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

18