# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56794-6-II |
| Respondent, | |
| v. | |
| COREY DEAN NOBLE, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Corey Dean Noble appeals his conviction for assault in the second degree by strangulation for choking his then 17-year-old daughter, B.N. He argues that the State failed to present sufficient evidence to prove he had the requisite intent to strangle B.N. He also contends that the State failed to disprove self-defense beyond a reasonable doubt. Because sufficient evidence supports his conviction, we affirm.

FACTS

I.    BACKGROUND

After 17 years in the Army, where he completed combative training, Noble retired. He lived at home with his wife, two biological daughters, and his stepson.

In the early morning of July 15, 2021, Noble and his oldest daughter, B.N., got into a physical altercation. The following day, the State charged Noble with one count of assault in the second degree-domestic violence and one count of malicious mischief in the third degree-domestic violence.[1]

---

[1] The State later voluntarily dismissed the malicious mischief charge.

II.    JURY TRIAL

On February 17, 2022, Noble's jury trial began.  The court heard testimony from physician assistant Katherine Thompson, Dr. Lawrence Lavine, police officers John Cody White and Matt Leitgeb, Noble's wife Corina, his daughter B.N., adult stepson Dustin Miller, and Noble.[2]

A.    B.N.'s Testimony

B.N. testified that a month before the incident, she and Noble argued regarding her schooling, which led to Noble breaking down her bedroom door.  However, it did not get physical between them.

On the day of the altercation, B.N. testified that Noble seemed agitated and intoxicated. Around 3:30 AM, B.N. left her room to use the restroom and noticed Noble in the other room.  She returned to her room, shut the door, and laid down.  Shortly thereafter, she heard knocking at her door, but she did not open it "[b]ecause it was 3:00 [in] [the] morning, and [she] wanted to go to bed."  2 Rep. of Proc. (RP) at 119.  However, Noble continued hitting the door until it was "off of its hinges" and "started to break."  2 RP at 121.  Noble did not stop, so B.N. grabbed a box cutter she had next to her "[b]ecause [she] felt as if [she] was going to be in danger soon."  2 RP at 121.

After Noble stood in the doorway after breaking down the door, B.N. extended the box cutter out and told him to back off, but Noble lunged at her instead.  Fearing that she "would be physically hurt," she held the box cutter out in "an act of defense."  2 RP at 123.  B.N. stated she did not see Noble get cut but noted it was reasonable to assume so, given that she saw the cuts after the incident.

---

[2] To distinguish Corina from Noble, we use her first name.  No disrespect is intended.

B.N. recalled that the box cutter landed under her desk as she and Noble wrestled to the ground. Noble then dragged B.N. by her ankles and put her in a headlock with his body behind her and with "one of his arms over [her] throat . . . [a]nd squeezing." 2 RP at 124-25. B.N. tried to speak, but it "was very difficult . . . and [she] struggled to breathe." 2 RP at 125.

As she tried to escape the headlock, Noble placed both of his hands around her throat "just about where the Adam's apple is" and "used his thumbs to cover [her] jugulars and press[ed] into them" making her feel "pressure in [her] head," which she described as "tunnel vision." 2 RP at 126-27. B.N. described the pressure and pain on her throat as an eight out of ten. As Noble continued to press his hands onto B.N.'s throat, her older brother Dustin appeared and she labored out "call the police." 2 RP at 127.

After Noble left her room, B.N. and Dustin went to the kitchen. Dustin stood between Noble and B.N. as B.N. reached for a knife from the rack immediately behind her, noting she was "worried that [Noble] might try and hurt" them and needed to defend herself and her brother. 2 RP at 130.

After the incident, B.N. talked with officers and showed her injuries, including blood on her nose, redness, and scratches on her neck and arms. She told the police she felt "kind of angry and full of dread and just generally shocked." 2 RP at 128. The officers took photographs of her injuries and some photographs that showed B.N. demonstrating how Noble placed his hands on her neck.

B.N.'s mother, Corina, took B.N. to the emergency room, where B.N. reported feeling some underlying pain while attempting to swallow and occasionally when trying to speak. B.N. stated that the hospital staff noticed small scrapes on her neck, but nothing severe enough to keep

her for observation and they discharged her. However, when she returned home, she experienced pain swallowing and a croaky, hoarse voice lasting for about a month.

B.     Noble's Testimony

The jury heard from Noble, who recounted the altercation with conflicting facts. He testified that, earlier that day, he was playing video games at his desk while eating dessert when B.N. came out and started screaming at him, saying, "shut the F up." 4 RP at 366. He then followed her, saw her enter her room, knocked out of habit, and reached for the doorknob. And as he did, the door slammed, trapping his left hand in the door. He tried to reach down to turn the doorknob, but it was locked. He knocked and yelled "my hands stuck. Open the door," with B.N. responding, "Shut the F up and leave me alone." 4 RP at 372. He knocked harder, but received no response. He then punched a hole, through the wood veneer, by the doorknob to try and reach inside in an attempt to free his hand. However, he could not, so he used his foot to kick the wooden edge of the door frame until it broke, releasing his hand.

He then made eye contact with B.N., who allegedly said, "I've had enough of this," raising the box cutter and charging toward him. 4 RP at 376-77. B.N. slashed Noble, but he threw his hands out in front of him to protect his face and eyes.

Noble then grabbed B.N. by the shoulders and walked her back to her bed, but B.N. continued flailing and stabbed him in the chest. As B.N. struggled and began to strike him with the box cutter, they slid to the ground, and Noble straddled her placing his arm on her shoulder to hold her down.

Noble testified that B.N. jammed the knife into him, causing blood to spray across her face—onto her nose and the side of her chin. Noble testified that at this point he "had concern for [his] own physical wellbeing." 4 RP at 386. He then turned his arm, palm up, and placed it across

4

B.N.'s upper chest while she was on the ground. He leaned forward, grabbed the arm holding the box cutter, and shook it to make the box cutter fly toward her desk.

B.N. turned her waist reaching for the box cutter, so Noble reached across her back, grabbed her shoulder, turned her to face him, and placed both his hands down on both sides of her collarbone and shoulder, holding her to the ground. He stated he did so because he was "trying not to get injured anymore, get cut anymore"—that is, out of concern for his life. 4 RP at 388. When asked if he was attempting to strangle B.N., he responded, "I was making no attempt to strangle her at all." 4 RP at 388. But, later on, Noble admitted that he "put [his] hands to either side" of B.N.'s neck. 4 RP at 440.

Dustin appeared at the door, phone in hand, when B.N. told him to call 911, and so Noble added, "Please, call 911," to which Dustin said he had. 4 RP at 388. Noble testified that he tried to get off B.N., but she came up right away, so he pushed her down again and used the momentum to get off her and leave the room.

Noble went to his bedroom to check his wounds and clean blood off his arm. After that, he went to the living room and kitchen area, where he saw Dustin and B.N. backed up in the corner, and B.N. began to yell. She turned and grabbed a knife, so he told her, "I'll knock you out," and Dustin got her to put the knife back on the rack. 4 RP at 390. Noble then exited the house and saw his wife outside on the phone with the police.

When asked at trial if he had been drinking that night, Noble admitted he normally has a drink in the evening, but that night he had three drinks between 5 PM and 10 PM. However, he stated he was not intoxicated.

5

C.      Law Enforcement Testimony

The trial court heard from officers White and Leitgeb.  Leitgeb arrived first at the scene, with White and the other responding officers arriving shortly thereafter.  Leitgeb testified that B.N. was distraught, very emotional, crying, and shaking upon arrival.  Likewise, White noted that he saw Dustin "super shooken [sic] up," with his hands trembling "an insane amount."  2 RP at 219.

B.N. then showed Leitgeb what Noble allegedly did to her by placing her hands around her neck and thumbs pressing against her windpipe.  Leitgeb noted redness on B.N.'s neck, minor scratches, and a cut by her eye with some blood but did not note any change in voice.  As to Noble, Leitgeb saw some injuries to his right arm but did not see any observable injuries to his fingers. The officers did not report that Noble had any other wounds.

D.      Expert Testimony

The State called Thompson who testified about the physiology of strangulation.  In turn, the Defense called Dr. Lavine.

Thompson testified that strangulation is the "external compression of the blood vessels supplying blood and taking blood away from the brain and the head."  3 RP at 258.  Therefore, it generally involves the neck area.

Thompson testified that the average grip strength of males is between 80 and 100 pounds per square inch (PSI).  She also testified that it only takes "about" 11 PSI to completely obstruct a carotid artery and between 4 and 11 PSI to obstruct the jugular vein.  3 RP at 263-64.  Thompson elaborated that when obstruction of the carotid artery or jugular vein occurs, "blood flow cannot continue to progress downwards out of the head and neck," increasing the pressure inside the head and vessels and causing the brain to lose oxygen.  3 RP at 260-61.

Thompson testified that not everyone who experiences strangulation necessarily loses consciousness or seeks medical help for various reasons. One reason is that victims do not want to come forward or are hesitant to do so. Another reason is that they do not necessarily know they were strangled due to the lack of oxygen getting to the brain, resulting in them not always remembering the incident.

Further, both Thompson and Lavine testified that the great majority of strangulation victims do not have external signs of injury. However, Thompson noted that even if a victim does present with injuries, it is typically delayed anywhere between hours to days later as the blood takes time to collect at the site of injury in any visible manner. Therefore, Thompson generally looks for other signs of strangulation, including a change in voice quality, complaints of pain, difficulty speaking, swallowing, or breathing. However, those that do report noted experiencing black spots in vision or tunnel vision, dizziness, coughing, difficulty breathing, and even loss of bowel or bladder function.

Next, Thompson analyzed the photo of B.N. demonstrating what occurred even though she did not interview her. Thompson noted that B.N. had two very small abrasions to the side of the nose and some irritation in the whites of her eyes. Thompson also noted that her neck showed general redness and faint superficial abrasions on either side, which could be consistent with strangulation.

D.    Corina's Testimony

Next, Corina testified that she did not interact with Noble much on the day of the incident, but when she did, he was "broody [and] moody." 2 RP at 173. She added that earlier in the day, Noble ate and then made himself a drink, and when he drinks, he gets "belligerent." 2 RP at 174. And that night it was "apparent . . . that he was intoxicated." 2 RP at 174.

7

Corina testified that around 3:30 AM her youngest daughter shook her awake. Corina's daughter informed her that Noble was kicking in B.N.'s door and proceeded to hide in their bathtub. Corina exited the bedroom and saw Dustin standing in the hall on the phone while B.N. was on the floor with Noble straddling her. She testified that B.N. was trying to push Noble off her and flailing her arms. Dustin then handed her the phone to talk with the dispatcher. However, it was difficult to hear with B.N. and Noble yelling in the background, so she went outside. She informed dispatch that Noble had been drinking that day.

After the incident, she took B.N. to the hospital as suggested and noted that B.N. was crying, describing her as "hysterical." 2 RP at 187. Corina then said that B.N. complained of pain when trying to swallow after leaving the hospital. She also noted B.N. had a "really, really rough voice afterward[] for about a week or so." 2 RP at 180.

Corina testified that this was not an isolated incident. She testified that Noble had broken B.N.'s door just a month prior following another verbal argument.

E.    Dustin's Testimony

Dustin, Noble's stepson, testified that he was in his room for most of the day and did not notice anything strange about Noble. However, he did recall that later in the day, Noble entered his room, said he did not feel like talking, told him not to say anything, handed him some fruit, and left. Dustin woke up to a loud bashing and banging, and when he opened his door, he saw Noble "ripping parts off" B.N.'s door. 2 RP at 162. Dustin then went back into his room and grabbed his phone. Afterward, he saw Noble pulling B.N. by the ankles and dragging her off her bed onto the floor. Noble then "started choking her," noting he did so the "entire time, just [using] different holds as she struggled," and "[a]s she moved to almost break the holds, he would change

8

it so that she couldn't get out." 2 RP at 163, 166. Dustin testified that B.N. then told him to "[c]all the police" with a cracked voice. 2 RP at 164.

While on the phone with dispatch, Dustin testified that he felt shaky. Dustin testified that he saw Noble with his arms around B.N.'s neck, choking her, and heard her voice change and struggle. On the phone with dispatch, Dustin described that "my dad is currently holding my sister to the ground . . . he's drunk . . . he broke down her door and is holding her to the ground." Ex. 23A, at 0 min., 0 sec. to 1 min., 0 sec.

Dustin testified that he and B.N. eventually went to the kitchen and he stood between her and Noble. B.N. grabbed a knife to defend herself, but Dustin stated that he told her not to and to put it back.

III.    VERDICT

The jury found Noble guilty of assault in the second degree by strangulation. Noble appeals.

ANALYSIS

I.    SUFFICIENCY OF THE EVIDENCE

Noble argues that the State presented insufficient evidence to prove that he had the requisite intent to strangle B.N. We disagree.

A.    Legal Principles

Under both the federal and state constitutions, due process requires that the State prove every element of a crime beyond a reasonable doubt. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). Thus, "sufficiency of the evidence is a question of constitutional law that we review de novo." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

To determine whether the evidence is sufficient to support a conviction, we consider whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Under this standard, the defendant admits the truth of the State's evidence, and we must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the State. *Id*. at 265-66. Circumstantial evidence and direct evidence are considered equally reliable. *Id*. at 266. We will not review the finder of fact's credibility determinations. *Id*.

Under RCW 9A.36.021(1)(g), "[a] person is guilty of assault in the second degree if he or she . . . (g) [a]ssaults another by strangulation or suffocation." "[S]trangulation" means "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). Therefore, the plain language of the statute "defines strangulation in two ways: (1) by the actual injury suffered by the victim, regardless of the specific intent of the perpetrator or (2) by the specific intent of the perpetrator to obstruct the victim's blood flow or breathing, regardless of the actual injury suffered." *State v. Reed*, 168 Wn. App. 553, 576, 278 P.3d 203 (2012); RCW 9A.04.110(26).

B.      The State Presented Sufficient Evidence to Prove Assault in the Second Degree

Noble contends that his only purpose during the altercation was to disarm B.N. and protect himself from the box cutter she held, which he argues is supported by a comparison of the minor scrapes she had versus the three slashes on his arm and the one on his chest. He also argues that the State was required to prove he had the specific intent to obstruct B.N.'s blood flow or ability to breathe.

The State responds, in conformity with RCW 9A.36.021(1)(g) and RCW 9A.04.110(26), that it need only show either that B.N.'s blood flow or ability to breathe was actually obstructed to some degree when Noble compressed her neck or that he specifically intended to obstruct her airway or blood flow. We agree with the State.

At the outset, Noble fails to acknowledge the subalternatives within the distinct strangulation alternative of the assault statute. While there is a specific intent subalternative within RCW 9A.36.021(1)(g) and RCW 9A.04.110(26), Noble's position that the State is required to prove intent to obstruct blood flow or ability to breathe is inaccurate. *See State v. Christian*, 18 Wn. App. 2d 185, 202, 489 P.3d 657 (2021) (stating that "'the alternative means analysis does not apply to subalternatives,'" because "'the alleged alternatives are minor nuances inhering in the same act,'" making them "'facets of the same criminal conduct.'") (internal quotation marks omitted) (quoting *State v. Espinoza*, 14 Wn. App. 2d 810, 819, 474 P.3d 570 (2020)). Rather, the State may proceed on either or both subalternatives presented within the strangulation alternative of the assault in the second degree statute.[3]

RCW 9A.36.021(1)(g) and RCW 9A.04.110(26) clearly define strangulation to include among the two subalternatives "compress[ion] [of] a person's neck, thereby obstructing the person's blood flow or ability to breathe." The State need not *also* prove that Noble specifically intended to obstruct B.N.'s blood flow or ability to breathe.

    1.    The State Met the Actual Obstruction Prong Set Out in the Statutes.

Next, viewing the evidence in light most favorable to the State, the record supports the actual obstruction prong, that is that Noble strangled B.N. such that he obstructed her blood flow

---

[3] Noble does not make any argument regarding unanimity of the jury verdict, the issue squarely addressed in *Christian*, 18 Wn. App. 2d 185. Accordingly, we do not address the issue here.

or the ability to breathe. Specifically, testimony from B.N., Dustin, and Corina described the incident as Noble placing his hands on B.N.'s neck, constricting her ability to breathe and talk, and "choking" her. 2 RP at 163; 4 RP at 453. Testimony also showed that B.N. experienced tunnel vision, a horse, shaky voice for a week, and had trouble swallowing.

Noble calls into question the evidence of actual obstruction because some of B.N.'s symptoms did not appear immediately on the day of the incident. But, Thompson's and Lavine's testimony was that the great majority of strangulation victims do not have external signs of injury. Thus, even if a victim presents with injuries, the injuries are typically delayed between hours to days later. In addition, other signs including a change in voice quality, complaints of pain or difficulty speaking, swallowing, or breathing can be used to recognize if someone has been strangled. B.N. reported pain in swallowing at the time of the incident, along with difficulty breathing and resultant tunnel vision while being strangled. While the change in her voice quality didn't come about until shortly after the incident date, such a delayed appearance of that symptom is consistent with Thompson's and Lavine's testimony when viewed in the light most favorable to the State.

Moreover, photographs admitted at trial demonstrated redness around B.N.'s neck, bloodshot eyes, and a cut on her nose. And as Thompson's testimony mentioned, those injuries are consistent with signs of strangulation. Thus, the record contains sufficient evidence of injury that the jury could infer that B.N.'s airway and blood flow were at least partially obstructed— satisfying the actual obstruction prong

Noble relies on *State v. Rodriguez*, 187 Wn. App. 922, 352 P.3d 200 (2015), for the proposition that B.N. needed to have suffered lasting or permanent injuries around her neck to show strangulation, he argues that because B.N. did not suffer any long-term side effects from the

alleged strangulation, the evidence of strangulation was insufficient. Specifically, Noble argues that there was no indication that B.N. sought medical treatment or reported any difficulty swallowing, breathing, or talking following her discharge from the hospital on the night of the incident, which shows that he did not strangle B.N.

But contrary to Noble's argument, neither the statute nor applicable case law required the jury to find B.N. suffered permanent or lifetime injuries in order to convict Noble of assault in the second degree. RCW 9A.36.021(1)(g). So, Noble's reliance on *Rodriquez* is misplaced for that reason alone.

But Noble's reliance on *Rodriguez* is misplaced for another reason. The *Rodriguez* court did not solely rely on the permanent scarring to affirm the conviction. 187 Wn. App. at 935-36. Instead, it reasoned that the evidence established that Rodriguez grabbed the victim more than once by the throat and squeezed, causing her difficulty breathing for minutes afterward, in addition to causing permanent scarring. *Id*. While scarring was an aspect of the injuries evidencing the strangulation in that case, the *Rodriguez* court did not hold that permanent scarring is *required* to sustain a conviction for assault in the second degree. *Id*.

### 2. Intent Prong

Even if we did not conclude there was sufficient evidence of actual obstruction, Noble's argument that there was insufficient evidence of the requisite intent to strangle B.N. also fails. The jury could infer from the record that the physical injuries inflicted by Noble upon B.N., specifically to her neck and throat, demonstrate an intent by Noble to affect B.N.'s breathing or blood flow. The State presented sufficient evidence of the subalternative "intent" prong as well. Sufficient evidence supports that Noble intended to commit assault in the second degree.

II.     SELF-DEFENSE

Next, Noble contends that the State failed to disprove self-defense beyond a reasonable doubt. We disagree.

A       Legal Principles

Self-defense is an affirmative defense to the charge of assault in the second degree. *State v. Tullar*, 9 Wn. App. 2d 151, 156, 442 P.3d 620 (2019). RCW 9A.16.020(3) defines self-defense as:

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
> (3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person . . . in case the force is not more than is necessary.

The term necessary is defined as "no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1).

When self-defense is properly raised, the State bears the burden to prove the absence of self-defense beyond a reasonable doubt in order to sustain a finding of guilt. *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020). When evaluating the sufficiency of the evidence of self-defense, we must determine what a reasonably prudent person would do if standing in the defendant's shoes. *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010). This includes both a subjective and objective test. *State v. Walden*, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997). Under the subjective test, the court must "place itself in the defendant's shoes and view the defendant's acts in light of all the facts and circumstances the defendant knew when the act occurred." *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002). The objective test requires the court to "determine what a reasonable person would have done if placed in the defendant's

14

situation." *Id*. "Accordingly, the degree of force used in self-defense is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant." *Walden,* 131 Wn.2d at 474.

However, a defendant cannot invoke a self-defense claim when they are the initial aggressor "because the victim of the aggressive act is entitled to respond with lawful force." *State v. Kee*, 6 Wn. App. 2d 874, 879, 431 P.3d 1080 (2018). Stated another way, "[t]he provoking act must be intentional, but it cannot be the actual, charged assault." *Id*.

B.       The State Disproved Self-Defense by Showing Noble was the Initial Aggressor.

Here, viewing the evidence in the light most favorable to the State, there is sufficient evidence that Noble was the initial aggressor. The record shows that B.N. was in her room when Noble came to her door after seeing her go in. He then started knocking and breaking down her door when she did not answer or open it. His actions then caused the door to unlatch, and B.N. closed it again, not knowing Noble was still there. Consequently, Noble began hitting the door causing it to come off its hinges and creating a hole through the veneer, making the door fall away completely in pieces. B.N., fearing harm, grabbed a box cutter. Noble then stepped into her room, pushed her onto the bed, placed her in a choke hold, and dragged her onto the floor, all in spite of being cut by B.N. Clearly, sufficient evidence supports that Noble was the initial aggressor.

Next, in an attempt to show reasonableness of force used, Noble argues that he let B.N. go after she was disarmed. However, when viewing the evidence in the light most favorable to the State, as we must, the record shows that the force Noble used was not reasonable. Rather, the record shows that Noble disarmed B.N. early in the struggle. But Noble then dragged her by the ankles and put her in a headlock, obstructing her blood flow and ability to breathe. The State

presented sufficient evidence both that Noble was the initial aggressor, and that the degree of force used after disarming B.N. was unreasonable. This argument fails.

## CONCLUSION

The State presented sufficient evidence to prove assault in the second degree and to disprove self-defense. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Glasgow, C.J.

_____
Che, J.