# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JAREL NEWSON,<br><br>Appellant. | No. 56992-2-II<br><br><br>UNPUBLISHED OPINION |

CHE, J.—After a bowling date, Jarel Newson and DM arrived back at DM's apartment. Later that evening, DM found a love letter written by Newson to his ex-girlfriend. DM and Newson started fighting, which ended with Newson pressing down on DM's neck until she passed out. After DM regained consciousness and examined her injuries, she asked Newson to leave. He said he would not leave or return her phone unless she had sex with him. DM told him to leave again. Newson repeated his demand. DM removed her clothing and laid on the bed. Newson had sex with her. The State charged Newson with first degree burglary, second degree rape, and two counts of second degree assault.

The jury convicted Newson on all counts. Newson appeals, arguing that there is insufficient evidence to support his convictions. We hold sufficient evidence supports Newson's convictions. Thus, we affirm.

FACTS

In the summer of 2018, DM met Newson at an obstacle course race. They started dating shortly thereafter. The two broke up in August. But on September 22, 2018, they went on a bowling date where both of them drank alcohol. DM told Newson that she didn't want to have sex that night.

After bowling, they went back to DM's apartment for another drink. During the evening, DM realized she had lost her phone and began to search for it. She ended up searching Newson's car for her phone. There, she found her phone and also stumbled upon a love letter written by Newson and addressed to his ex-girlfriend. Upset, DM confronted Newson about the letter. He began yelling, and she pushed him. Newson shoved DM onto the bed and got on top of her. DM punched him in an attempt to get him off. Newson bit DM on the breast causing her to scream.[1]

In response to DM's screaming, Newson covered her mouth, nose, and throat with his hands. When Newson released some pressure, DM screamed again. Newson then pressed down even harder. DM could not breathe and passed out. DM woke up unsure of how much time had passed. She saw Newson sitting on top of her, and she spat blood on a nearby wall.

Newson told DM that she looked disgusting and should clean herself. In the bathroom, DM observed a gash on her nose, a split lip, and red marks all over her neck and cheeks. She remained in the bathroom for five to ten minutes. DM came out and told Newson that he needed

---

[1] DM testified that her breast bled and oozed for around a week. Three and a half years later, DM still had a scar "on the bottom portion [of her breast] right . . . where it's the darkest." Rep. of Proc. (RP) at 544.

to leave. Newson stood up and grabbed DM's phone. He told her that he would not leave nor give DM her phone unless she had sex with him.

DM again told Newson he needed to leave. Newson reiterated his demand. When asked to describe Newson's demeanor during this interaction, DM noted, "He looks like he has no soul in his eyes. And he looks like he wants to hurt you." 2 Rep. of Proc. (RP) at 610-11. Scared, DM then removed her pants and laid down. She thought Newson was going to hurt her again if she didn't have sex with him.

Newson had sexual intercourse with DM. DM testified that she did not move or participate and mentally was not present. Newson eventually stopped and began crying. He said, "you're only having sex with me because you want me to leave." RP at 552.

He then began saying he was going to kill himself by crashing into the concrete median on his way home. DM tried to talk Newson down for the next hour. Eventually, Newson and DM seemed to reach a compromise where he would sleep in the back seat of his car. While outside, DM told him he wasn't allowed back inside and went to get him a blanket. But when she returned, Newson had left.

DM called 911, informing the operator that Newson was going to kill himself. DM also told the operator that she and Newson got into a physical altercation. While DM was still on the phone, Newson knocked on the door, and DM let him in. Newson asked DM repeatedly who she was talking to. Shortly thereafter, law enforcement arrived. Law enforcement photographed DM's injuries that night and the following morning. Officers observed injuries to DM's mouth, neck, eyes, cheeks, and chest. Law enforcement arrested Newson.

On September 29, 2018, Dr. Robert Sapp, an emergency physician, evaluated DM. Dr. Sapp observed tenderness around the central neck and decided to take a soft tissue x-ray of the neck. Dr. Sapp determined there was nothing life threatening, and prescribed to DM a steroid for the swelling and hoarse voice. On October 4, 2018, Dr. Sanjay Chakrapani, a neuroradiologist, examined a computed tomography (CT) scan of DM's neck. Dr. Chakrapani determined DM's vocal folds were swollen. Dr. Chakrapani testified the injuries were consistent with strangulation or blunt trauma as potential causes.

The State ultimately charged Newson with first degree burglary, second degree rape, second degree assault by strangulation, and second degree assault by reckless infliction of substantial bodily harm. At trial, witnesses testified as noted above. Also, the trial court granted the State's request to certify Officer Erik Anderson as a strangulation expert. Officer Anderson reviewed photographs of DM's injuries and testified that her injuries were consistent with having been strangled. Officer Anderson also testified that a scratch mark on DM's neck was consistent with being a defensive wound.

At the close of the State's case, Newson moved to dismiss the first degree burglary charge due to insufficient evidence. The trial court denied the motion. The jury convicted Newson of first degree burglary, second degree rape, and two counts of second degree assault. The trial court merged the two second degree assault convictions, vacating the second degree assault by reckless infliction of substantial bodily harm conviction. Newson appeals.

## ANALYSIS

### I. LEGAL PRINCIPLES

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). To satisfy due process requirements, the State must prove every element of the crimes charged beyond a reasonable doubt in a criminal prosecution. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005).

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When the defendant challenges the sufficiency of the evidence, they "admit[] the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.* We consider circumstantial and direct evidence to be equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

### II. SECOND DEGREE RAPE

Newson argues that we must reverse his second degree rape conviction as the State failed to prove he forcibly compelled DM to have sex with him. We disagree.

"A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person: (a) By forcible compulsion." RCW 9A.44.050(1)(a). "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." Former RCW 9A.44.010(6) (2007).

"[F]orcible compulsion contemplates force that overcomes actual resistance or threats that place a person in actual fear." *State v. W.R., Jr.*, 181 Wn.2d 757, 765, 336 P.3d 1134 (2014). The victim's subjective reaction to the defendant's conduct cannot be the sole basis for forcible compulsion; rather, "there must be a causal connection between the fear and a communicated threat." *State v. Higgins*, 168 Wn. App. 845, 859, 278 P.3d 693 (2012).

Newson puts significant weight on *State v. Weisberg*, 65 Wn. App. 721, 829 P.2d 252 (1992) and *State v. Ritola*, 63 Wn. App. 252, 817 P.2d 1390 (1991). In *Ritola*, Ritola, a resident at a boys juvenile facility, suddenly grabbed a counselor's breast when she was turning off a gaming console, and then "instantaneously" removed his hand. *Id.* at 253. He was convicted of indecent liberties by forcible compulsion. *Id.* We reversed because there was no evidence showing that Ritola used force to overcome resistance nor evidence of any express or implied threat, for he caught the counselor by surprise such that she had no time to resist. *Id.* at 255.

In *Weisberg*, Weisberg, a clothing company manufacturer representative, invited P.C. to his apartment to select some clothing as a birthday gift. 65 Wn. App. at 723. P.C. began undressing and Weisburg suggested the clothes would fit better without underclothes. *Id.* When P.C. did not immediately remove her undergarments, Weisberg removed them for her without using force or threats. *Id.* Before P.C. changed back into her own clothing, Weisberg told her to lie on his bed. *Id.* P.C. said she did not want to. *Id.* But Weisberg told her to "go ahead and lay on the bed anyway." *Id.*

Weisberg removed his clothes and had sex with P.C. until she told him to stop, which he immediately did. *Id.* at 724. Weisberg was convicted of second degree rape by forcible compulsion. *Id.* On appeal, the State "contend[ed] that Weisberg, through his conduct and the

circumstances, impliedly threatened P.C. such that she feared physical injury if she did not comply with his demands." *Id.* at 725. We held that there was insufficient evidence to support the element of forcible compulsion as,

> a close examination of the record produces no indication of anything in Weisberg's communications with P.C., or in the situation, that would cause one to interpret "lay down on the bed anyway" as a veiled threat of physical injury. Absent conduct by Weisberg that produced P.C.'s stated fear, there is no forcible compulsion, an essential element of rape in the second degree.

*Id.* at 726.

Here, there is evidence of an implied threat. This case is unlike the surprise situation in *Ritola*. Newson did not catch DM by surprise; he gave her an ultimatum after a physical altercation and had intercourse with her. Moreover, the interaction is distinguishable from *Weisberg*. DM did more than express a desire to not have sex. She asked Newson to leave twice. And Newson did not simply suggest they should have sex anyway. After the two were engaged in a physical altercation, he twice provided an ultimatum that he would not leave or return her phone unless she had sex with him. And he did so with an intimidating demeanor. DM testified that she was scared Newson would hurt her if she failed to comply.

DM's physical injuries evidenced violence occurred between Newson and DM shortly before the rape. Unlike in *Weisberg*, where there was no evidence that Weisberg suggested or threatened harm to the victim, here the implied threat that placed DM in fear of death or physical injury happened shortly after being strangled by Newson to such a degree that DM lost consciousness and spat out a mouthful of blood upon regaining consciousness. In this context, there was a causal connection between DM's fear and the implied threat.

7

Viewing the evidence in the light most favorable to the State, we hold sufficient evidence supports the second degree rape conviction.

III. SECOND DEGREE ASSAULT

A. *Strangulation or Suffocation*

Newson argues we must reverse his conviction for second degree assault as there is insufficient evidence to show strangulation. We disagree.

"A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: . . . . (g) Assaults another by strangulation or suffocation." RCW 9A.36.021(1)(g). "'Strangulation' means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). And "'[s]uffocation' means to block or impair a person's intake of air at the nose and mouth, whether by smothering or other means, with the intent to obstruct the person's ability to breathe." RCW 9A.04.110(27). "[T]he statute applies equally to complete and partial obstructions of a victim's ability either to breathe or to experience blood flow." *State v. Rodriquez*, 187 Wn. App. 922, 935, 352 P.3d 200 (2015).

It is clear that sufficient evidence was presented at trial to support the jury's finding that Newson assaulted DM by strangulation. Newson covered DM's mouth, nose, and throat with his hands. DM tried to scream. Newson pressed down even harder. DM testified that she couldn't breathe when he did this, and then, she passed out. DM observed red marks around her neck shortly after regaining consciousness.

Based on photographs of DM's injuries taken that evening and the following morning, Officer Anderson testified that DM's injuries were consistent with having been strangled. More than a week after the incident, a CT scan of DM's neck was taken. Based on that scan, Dr. Chakrapani testified that the swelling in DM's vocal folds was consistent with having been strangled. Viewing the evidence in the light most favorable to the State, a rational juror could have found Newson compressed DM's neck and obstructed her breathing or blood flow, or that Newson blocked or impaired DM's intake of air at the nose and mouth with the intent to obstruct DM's ability to breathe.

We hold that the jury was presented with sufficient evidence to find Newson guilty of second degree assault by strangulation beyond a reasonable doubt.

B.   *Reckless Infliction of Substantial Bodily Harm*

Newson argues there is insufficient evidence of second degree assault by reckless infliction of substantial bodily harm as the bitemark on DM's left breast did not qualify as substantial bodily harm. "A case is moot if a court can no longer provide effective relief." *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984). Because the trial court already vacated count IV, second degree assault by reckless infliction of substantial bodily injury, finding that it merged with count III, second degree assault by strangulation, we can longer provide effective relief, and we decline to reach this argument.

IV.  FIRST DEGREE BURGLARY

Newson finally argues that insufficient evidence supports his conviction for first degree burglary as there is insufficient evidence to prove he unlawfully entered or remained. We disagree.

9

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). "A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2). When a person is told to leave the premises, that person's license to enter is specifically revoked. *State v. Davis*, 90 Wn. App. 776, 781, 954 P.2d 325 (1998).

Here, Newson entered DM's apartment lawfully. Later in the evening, Newson strangled DM causing her to pass out. After DM regained consciousness and examined her injuries, she told Newson to leave. He refused to leave unless she had sex with him. She told him to leave again. With an intimidating demeanor, he repeated his demand. As discussed above, Newson then raped her and left. DM's two demands for Newson to vacate her apartment constituted an express revocation of Newson's license to remain.

Indeed, at trial, the State emphasized how these demands revoked Newson's right to remain and then argued that his conduct during the rape satisfies the assault element of first degree burglary. On appeal, Newson ignores this timeframe. Instead, Newson maintains that he did not unlawfully enter or remain because, after the aforementioned events, he came back to the apartment later, and DM opened the door and allowed him to come in. But the crime of first degree burglary was already complete. The fact that DM let him in the apartment later that evening is inapposite.

Accordingly, we hold that there is sufficient evidence to show that Newson unlawfully remained, and we affirm the first degree burglary conviction.

10

No. 56992-2-II

## CONCLUSION

We hold sufficient evidence supports Newson's convictions. We affirm.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Che, J.

We concur:

Lee, J.

Glasgow, C.J.

11