# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>BILLY SCOTT SIGMON,<br><br>Appellant. | No.58621-5-II<br><br><br><br>UNPUBLISHED OPINION |

MAXA, J. – Billy Scott Sigmon appeals his convictions and sentence for second degree child molestation involving JC and three counts of first degree child molestation involving DJ. Sigmon served as a foster parent for many children. The two alleged victims in this case, JC and DJ, were foster children placed in Sigmon's home who later alleged that Sigmon had molested them.

The trial court sustained the State's objection to evidence that JC said he wished that Sigmon would unadopt his adopted son and adopt him instead and that JC said when he was leaving Sigmon's home that he would get back at Sigmon. Sigmon argues that the trial court erred in excluding these statements because they were admissible to show that JC had a motive to lie about the molestation. He also argues that the convictions involving DJ should be reversed because of the error involving JC. In addition, Sigmon challenges certain community custody

conditions and the imposition of the crime victim penalty assessment (VPA) and community custody supervision fees.

We hold that (1) the trial court abused its discretion in excluding JC's statements and the error was not harmless; (2) the evidentiary error regarding JC does not affect his convictions involving DJ; (3) as the State concedes, the community custody condition requiring urinalysis and breath analysis testing and prohibiting use of alcohol must be stricken; (4) as the State concedes, the community custody condition allowing for Department of Corrections (DOC) searches must be modified to require reasonable cause for a search; and (5) as the State concedes, the VPA and imposition of community custody supervision fees must be stricken.

Accordingly, we reverse Sigmon's conviction for second degree child molestation and remand for further proceedings; we affirm Sigmon's remaining convictions; and we remand for the trial court to strike the community custody conditions prohibiting alcohol or marijuana use and regarding urinalysis/breath analysis, to modify the community custody condition allowing DOC searches to include a reasonable cause requirement, and to strike the VPA and community custody supervision fees.

FACTS

In 2014, Sigmon was a licensed foster care provider. The State placed JC in Sigmon's foster home from January 10 to February 14. Four years later in 2018, JC reported to a youth shelter worker that Sigmon inappropriately touched his genitals.

In March 2016, DJ was placed in Sigmon's foster home. DJ later reported that Sigmon had inappropriately touched his genitals.

The State charged Sigmon with one count of second degree child molestation against JC and three counts of first degree child molestation against DJ.[1]  For each count, the State alleged as an aggravating factor that Sigmon used a position of trust or confidence to commit the offense.

*JC's Testimony*

JC testified that Sigmon asked JC and Sigmon's adopted son JS to come into his bedroom and rub lotion on his legs.  Sigmon then told JS to leave and told JC to get into the bed with him.  JC testified that Sigmon then touched his genitals.  A few weeks later JC was removed from Sigmon's foster house.

On cross-examination, Sigmon's attorney asked the following:

Q.  Did you get along with [Sigmon's] son, [JS]?
[STATE]:  Objection; relevance.
THE COURT:  I'm sustaining the objection.

Report of Proceedings (RP) (July 17, 2023) at 118.

Sigmon also attempted to ask JC about why he left Sigmon's foster home.  Sigmon asked,

Q:  Is it also your understanding that you were leaving the house because you and [JS] weren't getting along?
[STATE]:  Objection
THE COURT:  What's the basis for the objection?
[STATE]:  How is that relevant?
[Sidebar discussion]
THE COURT:  Okay.  For the record, the State's objection was sustained.

RP (July 17, 2023) at 122.

---

[1] The State initially charged Sigmon for child molestation of an additional child, ST.  The information was amended to remove those allegations and the charge regarding ST did not go to trial.

The trial court later clarified on the record that Sigmon wanted to question JC about the reasons for wanting to transfer from the foster care home. Sigmon said that his contention was that JC left the house because of the contentious relationship between JC and JS. The State argued that it was irrelevant evidence and excluded by ER 404(b) as prior bad acts. The court sustained the objection.

*DJ's Testimony*

DJ testified that he lived with Sigmon when he was in fifth grade. He stated that Sigmon touched his genitals when he was 11 years old. DJ testified that Sigmon molested him three times in Sigmon's bedroom. DJ stated that Sigmon threatened him not to tell anyone because no one would believe him.

*Midtrial Motion in Limine*

The State filed supplemental motions in limine before Sigmon's presentation of evidence. The State moved to exclude any testimony that JC was trying to get Sigmon to "unadopt" JS, his adopted son. Clerk's Papers (CP) at 39. The State argued that the information was irrelevant and hearsay. Sigmon stated that the evidence would show that JC had said, "I want you to adopt me. I want you to un-adopt [JS]. I want to be the son."[2] RP (July 24, 2023) at 19. Sigmon argued that the information was relevant because it spoke to JC's motive and fell under the then existing state of mind hearsay exception.

Sigmon then argued,

They're entirely relevant because years later, [JS] runs into JC at the YMCA and they have a brief conversation.

[JS] says: . . . Things are good at home. How's it going with you?

It's not going well at all. I'm bouncing from foster home to foster home.

---

[2] The implication was that JS would testify that JC made this statement.

[JS] says [JC's] demeanor goes from kind of pleasant to really angry.

And weeks later there's a disclosure about Mr. Sigmon. And . . . it connects to his anger at not being adopted and [JS] being the one adopted. . . . . And to say that we can't explain that anger and why these allegations came up would handcuff us. Because otherwise, there's no explanation for the allegations.

RP (July 24, 2023) at 19. The trial court granted the State's motion and excluded JC's statements that he wanted Sigmon to unadopt JS and adopt him instead. The court's order stated that the basis for the motion and the ruling was relevance and hearsay.

The State also moved to exclude any evidence of JC fighting with JS in Sigmon's home, which Sigmon opposed because the evidence showed a potential motive to lie. Sigmon argued,

A lot of this goes to motive, the motive of [JC] to tell this story, to why he came up with it. And as counsel is aware, one of the things that there was a number of conversations about – and I think it's also one of the motions here – about [JC] wanting to be the adopted son instead of [JS]. And the anger when that didn't happen, the anger that that created, it is the defense contention, plays into why the allegations came out.

RP (July 24, 2023) at 17. The trial court granted the State's motion.

*Defense Testimony*

Sigmon called two witnesses: JS and Sigmon's adult daughter Melissa Ruzich.

JS stated that he was adopted by Sigmon when he was eight or nine years old. He testified that Sigmon had undergone numerous back surgeries and could not bend down and that his legs dry out, which was why children assisted Sigmon in putting lotion on his legs. He also stated that nobody went into Sigmon's room because Sigmon was never in there. Instead, Sigmon was always in the living room because of his back. JS testified that he had conflict with JC. He further testified that DJ would continue to show up to Sigmon's house months after he left Sigmon's foster home.

5

Ruzich testified that she frequently was at Sigmon's house. She testified that while JC was in the house, Sigmon slept in a recliner due to back surgery. She also testified that Sigmon did not sleep in his bedroom or stay in that room for any reason. Ruzich stated that Sigmon had to sit in that chair because he would not be able to go from a standing position to a sitting position.

Sigmon then attempted to ask Ruzich about JC's interactions with other people in Sigmon's home:

> Q. Did [JC] get along with the rest of the household?
> [STATE]: Objection, Your Honor. Relevance.
> THE COURT: Sustained.

RP (July 24, 2023) at 61. Sigmon then attempted to ask about the circumstances surrounding JC leaving Sigmon's home.

> Q. When [JC] was leaving, did you help him pack?
> [STATE]: Objection. Relevance.
> THE COURT: Sustained.
> . . .
> Q. Did [JC] say anything to you right before he left?
> [STATE]: Objection, Your Honor. Hearsay.
> [DEFENSE]: This is state – this is his state of mind at the time he's leaving.
> THE COURT: I'm going to sustain the objection. I don't get that from the question.
> Q. When [JC] was leaving, did he say something to you – just yes or no?
> [Court instructs witness to allow counsel to finish the question.]
> [STATE]: Your Honor, can we [sic] have a sidebar, please?

RP (July 24, 2023) at 67-68.

The State then argued that Sigmon was attempting to get in a statement from JC "along the lines of: I will get back at you for this." RP (July 24, 2023) at 68. Sigmon agreed that he was attempting to elicit this evidence. The State argued,

> It also, as identified earlier on the sidebar, would cause confusion because it identifies an act or something. I'm going to get you for that. Leaves the jury to question what that is, which frankly, does not – is – I don't know what she's going

6

to say, but I'm presuming that it's going to be something that this Court has already ruled inadmissible, specifically the fighting, the un-adopting, any of the other things that we dealt with in motions in limine.

RP (July 24, 2023) at 70. Sigmon argued,

The state of mind is of the declarant and it's the declarant's statement about his future – about his intent which is in his mind at that moment. He said that he would get back at them. I don't know if he said "them" or "him" when he was talking to [Ruzich], whether he was talking about getting back at Mr. Sigmon or the whole family. I think it would largely depend on what she testified to explicitly.

The Court . . . has eliminated all of the hostility that – 90 percent of the hostility that was going on in that house with respect to [JC] and the rest of the household. . . . .

But what it is left with is that the motive for him, [JC] to tell this story, to make these accusations is directly related to the hostility in that house. He didn't like them and he made these [sic] accusation.

And while the Court believes that [the] hostility is irrelevant, what we're down to is the last statement where he says: I'm going to get back at you. And it is *part and parcel for the defense theory of the case that [JC] had a motive to tell this story*. And he expressed his intent even on the way out the door. . . . But his disdain for the people in that house is not clear to this jury absent us letting them know that at least on one occasion he basically told them that he would get back at them.

RP (July 24, 2023) at 70-71(emphasis added).

The trial court then acknowledged that JC's statements to Ruzich that go to JC's state of mind "could be relevant and probative." RP (July 24, 2023) at 74. The court then stated,

However, when looking at Evidence Rule 403, the balancing test for whether relevant evidence should be excluded or not because the probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, misleading the jury, etcetera, and given the fact the Court has already ruled on the exclusion of the evidence about fighting, evidence about discord in the home, evidence about [JC]'s feelings about Mr. Sigmon and the other people in the home, just that statement alone, I believe, would be confusing to the jury without any explanation, and so I'm going to exclude it.

RP (July 24, 2023) at 74-75.

Ruzich then testified about DJ. She stated that DJ referred to Sigmon as his father and Ruzich as his sister. Ruzich testified about discussions regarding Sigmon potentially adopting

DJ. She testified that the family discussed adopting DJ and that they appeared to agree that they wanted DJ to be a part of the family. Ruzich also testified that after DJ left Sigmon's foster home, he showed up to Sigmon's house and begged to be allowed to stay there.

*Verdict and Sentence*

The jury found Sigmon guilty on all counts and also found that Sigmon used a position of trust to commit the crimes. The trial court sentenced Sigmon to 116 months for second degree child molestation regarding JC and 198 months to life for each of the counts of first degree child molestation regarding DJ.

The trial court found Sigmon indigent under RCW 10.101.010(3)(a)-(d). But the court imposed a $500 VPA. As part of his community custody conditions, the trial court ordered Sigmon to pay community custody supervision fees, to consent to home visits and inspections from DOC, to refrain from consuming alcohol or marijuana, and to submit to urinalysis and breath analysis upon request.

Sigmon appeals his convictions, certain community custody conditions, and imposition of the VPA.

ANALYSIS

A.    EXCLUSION OF JC'S STATEMENTS

Sigmon argues that the trial court violated his constitutional right to present a defense by excluding evidence that JC wished Sigmon would "unadopt" JS and adopt him instead and Ruzich's testimony that JC told her that he would "get back" at Sigmon, both of which would show JC's potential motivation to lie about the molestation. Br. of Appellant at 8-19. We conclude that the trial court abused its discretion in excluding the evidence, so we need not address the constitutional issue.

1.    Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022). The Supreme Court has developed a two-step process when addressing evidentiary rulings and the right to present a defense. *Id.* at 58. First, we analyze the trial court's rulings for abuse of discretion. *Id.* "Trial courts determine whether evidence is relevant and admissible." *Id.* at 59. An abuse of discretion occurs if no reasonable person would take the trial court's position. *Id.*

If we determine that the trial court abused its discretion in excluding evidence, we analyze whether the error was harmless under the nonconstitutional harmless error standard. *See Jennings*, 199 Wn.2d at 59. Under this standard, we analyze whether there is a reasonable probability that the trial would have been materially affected if the error had not occurred. *State v. Broussard*, 25 Wn. App. 2d 781, 793, 525 P.3d 615 (2023).

Only if we conclude that the trial court did not abuse its discretion in excluding the evidence do we consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Jennings*, 199 Wn.2d at 58.

2.    Evidentiary Analysis – JC Statements

a.    Legal Principles

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Although relevant, evidence still may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. And trial courts are permitted to

9

" 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *Jennings*, 199 Wn.2d at 63 (alteration in original) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

We review the exclusion of evidence based on relevance for an abuse of discretion. *Broussard*, 25 Wn. App. 2d at 787. "A decision that is either contrary to law or based on an incorrect application of an evidentiary rule is an abuse of discretion." *Id.* at 787-88.

Hearsay is an out of court statement offered for the truth of the matter asserted. ER 801(c). Hearsay evidence is not admissible unless a hearsay exception applies. ER 802. There is a hearsay exception for a statement of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" falls within an exception to the hearsay rule. ER 803(a)(3). The word "then" in the phrase "then existing" refers to the time the statement was made. *State v. Sanchez-Guillen*, 135 Wn. App. 636, 646, 145 P.3d 406 (2006). This hearsay exception includes statements describing the declarant's emotions or feelings. 5C Karl B. Tegland, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.10 (6th ed. 2016).

We review de novo whether a statement constitutes hearsay and whether a hearsay exception applies. *State v. Carte*, 27 Wn. App. 2d 861, 877-78, 534 P.3d 378 (2023), *review denied,* 2 Wn.3d 1017 (2024).

  b. Statement that JC Wanted Sigmon to Unadopt JS and Adopt Him

The trial court excluded evidence that JC said that he wanted Sigmon to unadopt JS and adopt him instead because it was irrelevant and hearsay. We disagree.

Here, evidence that JC said he wished Sigmon would unadopt JS and adopt him instead – which was not elicited from JC – arguably is hearsay. Sigmon was offering the statement to prove the truth of the matter asserted – that JC actually wanted Sigmon to adopt him and was upset at Sigmon because he did not.

But JC's statement falls within ER 803(a)(3)'s exception for hearsay statements that show a then-existing state of mind. JC's statement that he wished Sigmon would unadopt JS and adopt him shows his mental feeling – what he wished – at the time he made the statement, and ER 803(a)(3) expressly references a statement of mental feeling. Therefore, JC's statement that he wished Sigmon would unadopt JS and adopt him instead fell under the hearsay exception in ER 803(a)(3).

And although the trial court excluded this evidence based on relevance, JC's statement was relevant. It would show a motive to lie about the molestation – that JC was upset at Sigmon because Sigmon did not adopt him.

We hold that the trial court erred in excluding evidence that JC stated that he wished Sigmon would unadopt JS and adopt him instead.

      c.    Statement that JC Would Get Back at Sigmon

The trial court excluded Ruzich's testimony that JC said that he would get back at Sigmon because it was more prejudicial that probative under ER 403. We disagree.

Initially, the State argues on appeal that this statement was inadmissible hearsay and that we can affirm on that basis. JC's statement to Ruzich arguably is hearsay. Sigmon was offering an out-of-court statement for the truth of the matter asserted – that JC was going to get back at Sigmon or his family. But the statement again falls under ER 803(a)(3)'s exception for then-existing mental state. The statement shows what JC's existing intent was at the time he made the

statement, and ER 803(a)(3) expressly references a statement of intent. Therefore, Ruzich's testimony that JC stated he would get back at Sigmon fell under the hearsay exception in ER 803(a)(3) and was admissible.

Regarding ER 403, JC's statement that he would get back at Sigmon is relevant. If believed by the jury, this statement shows that JC had a motive to lie about the molestation. And some motive to lie was highly probative of Sigmon's defense of general denial because JC's credibility was the key to the State's case. The statement would call JC's credibility into question and as the victim he was the only direct witness to the crime.

Regarding the ER 403 balancing, there was no risk of unfair prejudice. And the risk of confusion to the jury was minimal. The trial court was concerned that there was no evidence in the record that explained why JC wanted to get back at Sigmon.[3] The absence of a reason may go to the weight of the evidence, but it did not make JC's evidence confusing. All the jury needed to know was that JC threatened to get back at Sigmon for whatever reason, which would call into the question the credibility of the sole direct witness to the crime. And weighing the credibility of witnesses is an essential function of the jury. *See State v. Rodriquez*, 187 Wn. App. 922, 930, 352 P.3d 200 (2015).

Therefore, we hold that the trial court abused its discretion when it excluded Ruzich's testimony that JC said he would get back at Sigmon.

c. Harmless Error

The State argues that any error in excluding the evidence was harmless. We disagree.

---

[3] There was no evidence explaining why JC wanted to get back at Sigmon because the trial court excluded evidence regarding JC's conflict with JS and JC's reasons for leaving Sigmon's home. Arguably, the court erred in excluding that evidence. And the court excluded evidence that JC wanted Sigmon to adopt him, which as discussed above was error.

The question under the nonconstitutional harmless error standard is whether there is a reasonable probability that the trial would have been materially affected if the error had not occurred. *Broussard*, 25 Wn. App. 2d at 793. Here, the statements Sigmon sought to admit through were highly probative of JC's credibility in front of the jury. If believed, a reasonable inference was that JC potentially lied about the molestation because he was upset at Sigmon for not adopting him or to carry out his threat that he would get back at Sigmon. JC was the only witness to testify that Sigmon molested him. Therefore, whether Sigmon actually molested JC rested entirely on JC's credibility. If Sigmon had been allowed the opportunity to offer the statements showing that JC had threatened Sigmon, a reasonable juror could believe Sigmon's theory that JC lied. This would have materially affected the trial because JC's credibility determined Sigmon's guilt or innocence.

Accordingly, we hold that the trial court's abuse of discretion was not harmless error and Sigmon's conviction for second degree child molestation must be reversed.[4]

3. Convictions Involving DJ

Sigmon briefly argues that if we hold that the trial court erred in excluding JC's statements, we must reverse all of Sigmon's convictions, including those with respect to DJ. We disagree.

Sigmon argues that the trial court's exclusion of evidence of JC's motive to lie prevented him from arguing that DJ had a motive to lie. He reasons that DJ's credibility was placed into question given inconsistencies in testimony during the trial and that DJ harbored similar anger toward Sigmon.

---

[4] Because of this holding, we do not address Sigmon's constitutional claim regarding the right to present a defense.

But Sigmon does not actually argue that the trial court made an evidentiary error with respect to his defense against the charges in which DJ was the victim. He does not assign error to any trial court rulings regarding DJ. And nothing in the record indicates that DJ had a motive to lie similar to JC's motive. DJ made no statements similar to the ones that JC made. JC's statements were unrelated to the charges involving DJ.

In addition, the evidence regarding the crimes against JC and those against DJ was distinct. The crimes allegedly took place two years apart. And both DJ and JC testified to different versions of events.

We hold that the trial court's evidentiary error only results in a reversal of the conviction involving JC, not to those convictions involving DJ.

B.   COMMUNITY CUSTODY CONDITIONS

1.   Alcohol and Marijuana Conditions

Sigmon argues, and the State concedes, that special community custody condition 11 prohibiting Sigmon from consuming alcohol and marijuana and special community custody condition 12 requiring Sigmon to submit to urinalysis and/or breath analysis must be stricken from his judgment and sentence. We accept the State's concession and remand for the trial court to strike these conditions.

2.   DOC Search Condition

Sigmon argues, and the State concedes, that community custody condition 8, which requires him to submit to DOC searches, must be modified because the condition does not require reasonable cause for searches. We agree.

RCW 9.94A.631(1) states that a CCO has authority to conduct warrantless searches of offenders under community custody supervision "[i]f there is reasonable cause to believe that an

14

offender has violated a condition or requirement of the sentence." Under this statute, it is constitutional for "a CCO to search an individual based only on a 'well-founded or reasonable suspicion of a probation violation.' " *State v. Cornwell*, 190 Wn.2d 296, 302, 412 P.3d 1265 (2018) (quoting *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009)).

Here, community custody condition 8 requires Sigmon to submit to all "DOC home visits" which includes "access for the purposes of visual inspection of all areas of residence." CP at 94. But the condition does not require reasonable suspicion.

Accordingly, we remand for the trial court to modify community custody condition 8 to include a reasonable cause requirement.

C.    LEGAL FINANCIAL OBLIGATIONS

Sigmon argues, and the State concedes, that the $500 VPA and community custody supervision fees should be stricken from his judgment and sentence. We agree.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). For purposes of RCW 10.01.160(3), a defendant is indigent if they meet the criteria in RCW 10.101.010(3). Although this amendment took effect after Sigmon's sentencing, it applies to cases pending on appeal. *Ellis*, 27 Wn. App. 2d at 16. The trial court determined that Sigmon was indigent under RCW 10.101.010(3)(a)-(d) and therefore the VPA cannot be imposed.

In 2022, the legislature eliminated trial courts' ability to impose community custody supervision fees. *See* LAWS OF 2022, ch. 29, § 7. RCW 9.94A.703, which dictates the conditions of community custody, no longer allows for the imposition of community custody supervision fees on convicted defendants.

Accordingly, we hold that the VPA and community custody supervision fees must be stricken from Sigmon's judgment and sentence.

CONCLUSION

We reverse Sigmon's conviction for second degree child molestation and remand for further proceedings; we affirm Sigmon's remaining convictions; and we remand for the trial court to strike the community custody conditions prohibiting alcohol or marijuana use and regarding urinalysis/breath analysis, to modify the community custody condition allowing DOC searches to include a reasonable cause requirement, and to strike the VPA and community custody supervision fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

VELJACIC, A.C.J.

GLASGOW, J.